**SO ORDERED.**

**SIGNED this 3rd day of April, 2015.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

___

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et. al.,** | CASE NO. 08-22786 (jointly administered) |
| DEBTORS. | CHAPTER 7 |
| **CHRISTOPHER J. REDMOND,** Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc., | |
| PLAINTIFF, | |
| v. | ADV. NO. 09-06070 |
| **SPIRITBANK,** | |
| DEFENDANT. | |

**MEMORANDUM OPINION AND ORDER
DENYING THE TRUSTEE'S MOTION IN LIMINE**

In the remaining counts of this adversary proceeding, the Chapter 7 Trustee of the Debtor Brooke Corporation (Brooke Corp) seeks to avoid certain transfers from Brooke Corp to Defendant SpiritBank under 11 U.S.C. § 548 or § 547 and to recover the avoided transfers under § 550. Discovery has been completed. The matter before the Court is the Trustee's Motion in Limine to Exclude the Opinion and Report of SpiritBank's Expert,[1] Jack F. Williams. The motion was taken under advisement following oral argument held on March 27, 2015. Plaintiff appeared by John J. Cruciani of Husch Blackwell LLP. SpiritBank appeared by Heather S. Esau Zerger of Zerger & Mauer LLP and Kenneth E. Wagner of Latham, Wagner, Steele & Lehman, P.C. The parties stipulated to jurisdiction of the Court and consented to trial and entry of a final order by the Bankruptcy Court.[2]

**BACKGROUND FACTS.**

Brooke Corp filed its Chapter 11 bankruptcy petition on October 28, 2008. Brooke Corp owned approximately 62% of Aleritas Capital Corporation (Aleritas), formerly known as Brooke Credit Corporation. On June 29, 2009, the Court entered an order converting the Debtors' bankruptcy proceedings to Chapter 7. Christopher J. Redmond was appointed Chapter 7 Trustee. Aleritas has not filed for bankruptcy protection, but its assets have been assigned to its creditors. SpiritBank does not controvert the report of the Trustee's expert that both Brooke Corp and Aleritas were insolvent from December 31, 2005 and thereafter.

---

[1] Doc. 136.

[2] Doc. 124.

In October 2006, Brooke Credit (Aleritas) and other Brooke related entities, including Brooke Corp, signed a Note and Warrant Purchase Agreement (NWPA), whereby Brooke Credit acquired approximately $45 million in secured financing. This is referred to as the Falcon-Jordan financing. Under the NWPA, Brooke Corp was liable upon the occurrence of a Mandatory Repurchase Event with respect to the Parent (Brooke Corp) if Aleritas did not repurchase the Notes. There is no evidence that any of the events constituting a Mandatory Repurchase Event with respect to the Parent occurred while the NWPA was in effect.

On March 6, 2008, Aleritas entered into a loan agreement with First State Bank of Gothenberg, Nebraska (FSB) in the approximate amount of up to $52.5 million to replace the Falcon-Jordan financing. FSB sold participation interests in the FSB/Aleritas loan, but SpiritBank initially declined the offer to purchase. Before the FSB/Alertias loan was fully subscribed, Brooke Corp approached SpiritBank with the concept Brooke Corp providing a secured Option Agreement to induce SpiritBank to purchase a $10,000,000 participation in the FSB/Aleritas loan. SpiritBank agreed to the concept and bought a $10,000,000 interest in the FSB/Alertias loan. The Option Agreement allowed SpiritBank to elect to be taken out of its participation interest by Brooke Corp before April 21, 2008. It also included Brooke Corp's pledge of security, including a $2,000,000 CD to be purchased as collateral for Brooke Corp's obligation to take out SpiritBank and purchase the participation interest. On March 7, 2008, $2,000,000 was

wired from a Brooke Corp account to SpiritBank for the purpose of purchasing the CD. The Trustee seeks to avoid this transfer as a fraudulent conveyance under § 548.

On April 11, 2008, SpiritBank exercised its take-out option, but Brooke Corp requested that the date be extended. A series of amendments extended the take-out date to October 10, 2008. Brooke Corp conveyed additional consideration to SpiritBank in the form of junior mortgages on real property and paid a deferral fee of $25,000 and legal fees of $8,000. The Trustee seeks to avoid these cash transfers under § 548.

On September 4, 2008, SpiritBank liquidated the $2,000,000 CD and received $2,012,491.67 which it applied to Brooke Corp's obligation under the Option Agreement, as amended. On September 10, 2008, SpiritBank and Brooke Corp executed the Third Amended Option Agreement extending the closing date of the Brooke Purchase Obligation to February 7, 2009.

This adversary proceeding was initiated by the filing of a Complaint against parties other than SpiritBank on June 18, 2009. SpiritBank was added as a defendant when the First Amended Complaint was filed on October 27, 2010.[3] A pretrial order was filed on December 16, 2014. It enumerates the relief sought by the Trustee. That relief includes a "[f]inding that Brooke Corp's execution of the Option Agreement (as amended), the

---

[3] Doc. 31. One of the counts was against a different defendant. That claim has been resolved by settlement and compromise approved by the Court. Allegations against SpiritBank regarding transfers of real estate have also been resolved by Joint Stipulation and Order. (Doc. 116).

4

purchase of the Brooke Corp CD and the payment of the Deferral Fees are avoidable as a constructively fraudulent conveyance under 11 U.S.C. § 548(a)(1)(B) and UFTA."[4]

**THE WILLIAMS EXPERT OPINION AND REPORT AND THE TRUSTEE'S MOTION IN LIMINE.**

SpiritBank has designated Jack F. Williams as an expert witness. He has prepared a report[5] on two elements of the Trustee's § 548 claim: (1) whether Brooke received reasonably equivalent value for its transfers to SpiritBank; and (2) whether Brooke had an interest in the $2 million CD pledged to SpirirtBank. The Trustee's motion in limine seeks to exclude the report and the opinions of Jack Williams from consideration at trial.

**A. Controlling Law.**

Federal Rule of Evidence 702 provides that a qualified expert may testify in the form of opinion if:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 703 provides in part that "[a]n expert may base an opinion of facts or data in the case that the expert has been made aware of or personally observed." Rule 704 provides

---

[4] Doc. 124, 7.

[5] Doc. 136-1.

5

Case 09-06070    Doc# 148    Filed 04/03/15    Page 5 of 16

that in general "[a]n opinion is not objectionable just because it embraces an ultimate issue," except in certain circumstances in criminal cases.

Under the Supreme Court's decision in *Daubert*,[6] Rule 702 imposes upon the trial judge the gatekeeping function of ensuring that expert opinion evidence is both relevant and reliable. This function applies whether the testimony is based upon scientific, technical, or other specialized knowledge.[7] Performing this function "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[8] "The focus, of course, must be on principles and methodology, not on the conclusions that they generate."[9] "But conclusions and methodology are not entirely distinct from one another."[10] In the Tenth Circuit, "any step that renders the expert's testimony unreliable renders the expert's testimony inadmissible."[11] A judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[12] Magistrate

---

[6] *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993)

[7] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

[8] *Daubert*, at 592-93.

[9] *Id*. at 595.

[10] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[11] *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009).

[12] *Kumho Tire*, 526 U.S. at 152.

O'Hara summarizes the law as follows: "Reliability analysis applies to all aspects of the expert's testimony, including the facts underlying the opinion, the methodology, and the link between the facts and the conclusions made. Consequently, the court must make a practical, flexible analysis of the reliability of the testimony, considering relevant factors and the circumstances of the case."[13]

**B. The Williams Report.**

The Williams report concludes, based upon Jack Williams examination of documents, that "Brooke Corp received substantial value, reasonably equivalent from an economic perspective, in exchange for the incurrence of the Brooke Corp Obligations . . . and the first priority security interest in the $2 million certificate of deposit ("CD")."[14]

---

[13] *Starling v. Union Pacific R. Co.*, 203 F.R.D. 468, 475 (D. Kan. 2001).

[14] Doc. 136-1, 47. The elements of value are identified as follows:

> (1) Benefit to Aleritas and benefit to Brooke Corp, as its parent, from the decrease in interest expense totaling approximately $21.4 million resulting from the retirement of the Secured 12% Notes [NWPA];
> (2) Benefit to Brooke Corp from the replacement of the mandatory repurchase obligation liability of approximately $51.7 million [in the NWPA] with the $10 million Brooke Corp Obligations;
> (3) Benefits to Brooke Corp resulting from the opportunity to retire the Secured 12% Notes [NWPA] outside of the contractual prepayment window and at a reduced premium, resulting in savings of not less than approximately $1.02 million;
> (4) Benefit to Brooke Corp from SpiritBank's acceptance of alternative forms of collateral in lieu of cash collateral as required under the Option Agreement [with Spirit] totaling approximately $5.125 million to $7.73 million;
> (5) Benefit to Brooke Corp from forbearance in the form of extensions of the closing date for the Brooke Corp Purchase Obligation [under the Spirit Option Agreement]; and
> (6) Benefit to Brooke Corp from forbearance in the form of a

7

The Williams opinion also concludes, from an economic and forensic perspective, that Brooke Corp did not appear to be the funding source of the $2 million used to purchase the CD.[15]

**C. The Trustee's Position.**

The Trustee in his initial brief in support of his motion in limine argues that the Williams report is based upon incorrect facts and is thus unreliable and should be excluded. Two categories of facts are identified: (1) Brooke Corp's liability with respect to the NWPA; and (2) the flow of cash used to purchase the CD. In addition, the Trustee argues that the Court need not consider the opinions and conclusions of Jack Williams because they invade the province of the Court as both fact finder and arbiter of the law. The Trustee's reply brief includes new arguments; it asserts that the opinion is unreliable

---

deferral of the exercise of SpiritBank's right to realize on collateral upon default. (*Id.*).

[15] *Id.* at 47-48. The reasons for this opinion are the following:

> (1) Brooke Corp operated through four operating subsidiaries—Brooke Capital, Brooke Bancshares, Brooke Brokerage, and Aleritas—and did not have its own operating assets. Therefore, the source of the funds was not Brooke Corp operations.
> (2) The source of funds appears to be (a) the non-Debtor depositors at Brooke Savings Bank; or (b) funds obtained through a $2 million loan from Aleritas on March 3, 2008, in contemplation of the FSB Loan and SpiritBank Participation. (*Id.* at 48).

8

because it ignores the stipulation that Aleritas and Brooke were insolvent and fails to evaluate the likelihood of Brooke's contingent liability on the NWPA.

As to Brooke's liability under the NWPA, the Trustee argues that "the central assumption of Williams' report is that Brooke Corp had an obligation to pay off Falcon/Jordan loan in the event that Aleritas was unable to do so . . ." and this "assumption is factually and legally incorrect."[16] According to the Trustee, Brooke Corp's liability was so contingent that it "was an obligation that Brooke Corp never would have actually realized or experienced because the probability of the contingency occurring was zero because it was a contingency that Brooke Corp fully controlled."[17] As to the failure of the Williams report to acknowledge the insolvency of Brooke and Aleritas, the Trustee notes that Jack Williams, in published articles, has recognized that a parent company does not receive reasonably equivalent value when guarantying the debt of an insolvent subsidiary.[18]

As to the purchase of the CD, the Trustee argues that the undisputed facts in the record show that Brooke Corp was the source of the cash used to purchase the CD. In his reply brief, the Trustee argues that SpiritBank has admitted the facts which evidence that Brooke was the source of the funds.

---

[16] Doc. 136, 14.

[17] Doc. 136, 15.

[18] Doc. 145, 7.

9

The Trustee also argues that the "touchstone" of admissibility of expert opinion evidence is it helpfulness to the trier of fact. He asserts that in this case the Court does not need help to understand the facts.

**D. SpiritBank's Position.**

As to Brooke's liability under the NWPA repurchase obligation, SpiritBank argues that the Williams report recognizes that the obligation was contingent and that the contingency had not occurred prior to Brooke entering into the Option Agreement with SpiritBank. "Prof. Williams' conclusion that Brooke Corp benefitted from the replacement of the mandatory repurchase obligation liability . . . with the . . . Option Agreement obligation does not require a default, or even a threat of default, of the Falcon Purchaser debt."[19]

As to Brooke's interest in the cash used to purchase the CD, SpiritBank emphasizes that Williams performed an analysis to determine if Brooke had an *economic* interest in the CD, not whether the purchase funds were provided from an account in the name of Brooke.

As to the argument that the report invades the province of the Court, SpiritBank argues that "Williams' opinion does not seek to define the legal parameters of avoidable transfers under applicable law, and the mere fact the Prof. Williams' opinion may include an economic or financial assessment of legal documents and concepts is not

---

[19] Doc. 137, 22.

problematic."[20] Rather, according the SpiritBank, "Williams' opinion offers insight and context into complex series of underlying transactions and a forensic and economic assessment of the value transferred and received by Brooke Corp."[21] SpiritBank also relies upon the principle that the gatekeeping function of *Daubert* is less important when the trial is to the court rather than to a jury.

**DISCUSSION.**

**A. The Court rejects the Trustee's position that the Williams report and Jack William's testimony should be excluded because they are unreliable.**

**1. The Williams report and opinion testimony will not be excluded from evidence as unreliable because based upon the assumption that Brooke was obligated to pay the Falcon/Jordan note in the event of monetary default by Aleritas.**

The Trustee challenges the reliability of the Williams report based upon the contention that Jack Williams *assumed* that "Brooke Corp was obligated to pay-off the Falcon/Jordan loan in the event of a monetary default by Aleritas."[22] Spirit refutes this premise stating that Williams' conclusions regarding benefit to Brooke from the replacement of Brooke's contingent liability under the Falcon/Jordan with the $10 million obligation under the Spirit Option Agreement does not require such an assumption.

Review of the Williams report convinces the Court that the assumption alleged by the Trustee was not made. The report states in part, "The Note Purchase Agreement [the

---

[20] Doc. 137, 29.

[21] Doc. 137, 28-29.

[22] Doc. 136, 14.

11

NWPA] included a mandatory repurchase provision triggered by certain 'change of control' events (The Mandatory Repurchase Event)."[23] The Williams report does not state that Brooke's repurchase obligation is triggered by a monetary default in the payment terms of the Falcon/Jordan loan. When discussing the value received by Brooke from the transaction with SpiritBank, Williams' opinion states,

> The retirement of the Secured 12% Notes resulted in interest savings of approximately $21.4 million over the term of the FSB Loan. As the majority owner of Aleritas, Brooke Corp benefited (sic) from this savings to its subsidiary. Furthermore, Brooke Corp provided a guaranty of certain mandatory repurchase provisions under the Note Purchase Agreement (as discussed in more detail above). Retirement of the Secured 12% Notes released Brooke Corp from this contingent liability.[24]

The Williams report does not erroneously assume that under the NWPA Brooke Corp was liable in the event of monetary default by Aleritas.

The Trustee also questions the reliability of the William report's conclusion that Brooke received reasonably equivalent value because Jack Williams failed to evaluate the probability that a Mandatory Repurchase Event would occur and did not acknowledge the stipulation that Brooke and Aleritas were insolvent at the time of the events in issue. Such deficiencies in the report, if proven at trial, would be a basis going to the weight of Jack William's opinion. They are not sufficient grounds to exclude the opinion from evidence, particularly when the trial will be to the Court.

---

[23] Doc. 136-1, 25.

[24] *Id*. at 32.

12

**2. The Williams report and opinion testimony will not be excluded from evidence based upon unreliability because of the conclusion that Brooke was not the source of funds used to purchase the $2 million CD.**

The Trustee contends that the Williams report is wrong because it ignores the actual facts of the case regarding the purchase of the CD. According to the Trustee, those facts show that the $2 million used to purchase the pledged CD came from Brooke Corp's banking account and that the funds were not traceable to a contemporaneous deposit by another Brooke entity.

William's report concludes, "from an *economic and forensic perspective*, and based on the facts and circumstances known to me as of the date of this Report, it does not appear that Brooke Corp was the funding source of the $2 million used to purchase the $2 Million CD"[25] because (1) Brooke operated through four subsidiaries and did not own its own operating assets and (2) the source of the funds were nondebtor depositors or a loan from Aleritas.

The Court finds that the apparent conflict about the source of funds is because the Trustee and Mr. Williams are addressing two different matters. The Trustee relies upon tracing from bank accounts and concludes that Brooke controlled the funds. The Williams report makes a determination of Brooke's interest in the funds based upon an economic and forensic perspective. Which perspective is the proper one to apply in a

---

[25] *Id*. at 47-48.

13

Case 09-06070    Doc# 148    Filed 04/03/15    Page 13 of 16

fraudulent conveyance action is a question of law which will be determined following trial.

The Court denies the Trustee's motion to exclude the Williams report as to the source of the funds used to purchase the CD. The disagreement is about how to define the source of the funds. Williams' report is not unreliable if the question is the economic source of the funds, rather that a tracing of money through bank accounts.

**B. The Williams report and opinion testimony will not be excluded because the opinions invade the province of the Court as fact finder and arbiter of the law.**

Expert opinion evidence should be admitted only when it will be helpful to the trier of fact.[26] The Trustee argues that because the material facts are undisputed and the factual issues are easy to understand, an expert is not required. SpiritBank responds that the Williams report offers insight and context into a complex series of transactions and a forensic and economic analysis of the value transferred and received. SpiritBank also argues that the gatekeeping function is relaxed when trial is to the court.

In the Tenth Circuit, when trial is to the court, the *Daubert* analysis must be undertaken if there is an objection to expert testimony, but the "usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise."[27] It follows that the concern about an expert opinion invading the province of the finder of fact is also of less concern when a jury is not involved. As stated in *Daubert*, "[v]igorous cross-

---

[26] Fed. R. Evid. 702(a).

[27] *Attorney Gen. of Okla.*, 562 F.3d at 779.

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[28]

The Court is capable of evaluating the appropriate weight to be given the Williams report and Jack Williams' testimony. Neither party cites Rule 704, which provides that opinion evidence is not automatically objectionable because it "embraces an ultimate issue." The Williams report addresses the two ultimate factual issues in the Trustee's § 548 claim: (1) Whether Brooke Corp transferred an interest in property (2) for less than equivalent value. If the trial were to be to a jury, there would be a serious concern that the Williams report and Jack Williams' testimony could invade the province of the finder of fact. But, since this case will be tried to the Court and the Williams report and opinion testimony address matters within the Court's experience as both a lawyer and a judge, it need not be excluded to avoid invasion of the province of the fact finder.

**CONCLUSION.**

Based upon the foregoing, the Court denies the Trustee's motion in limine and finds that the Williams report and Jack Williams' opinion testimony shall be not be excluded from evidence at trial on the grounds asserted by the Trustee. Although the Trustee's arguments as to reliability and intrusion into the Court's fact finding role raise legitimate concerns about the opinions, they are concerns which can be better evaluated at

---

[28] *Daubert*, 509 U.S. at 596.

trial, rather than by the blunt instrument of the granting of a motion in limine. At trial, the Court will evaluate the trustworthiness of the opinion evidence and determine its appropriate weight.

**IT IS SO ORDERED.**

###