**SO ORDERED.**

**SIGNED this 20th day of November, 2015.**



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

---

**Designated for print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et al.,** | **CASE NO. 08-22786** |
| DEBTORS. | **(jointly administered)** |
| | **CHAPTER 7** |
| **CHRISTOPHER J. REDMOND,** **Chapter 7 Trustee of Brooke** **Corporation, Brooke Capital** **Corporation, and Brooke Investments,** **Inc.,** | |
| PLAINTIFF, | |
| v. | **ADV. NO. 09-6070** |
| **SPIRITBANK,** | |
| DEFENDANT. | |

**POST-TRIAL**
**MEMORANDUM OPINION AND ORDER**

This adversary proceeding began with claims asserted against certain parties other

than SpiritBank, but SpiritBank was later added as a defendant and the claims against the

other defendants have been resolved.  In the remaining counts, Christopher J. Redmond, the Chapter 7 Trustee of the Debtors, Brooke Corporation (Brooke Corp), Brooke Capital Corporation (Brooke Capital), and Brooke Investments, Inc. (BII), seeks to avoid certain transfers from Brooke Corp to Defendant SpiritBank, including over $2,000,000 from the liquidation of a certificate of deposit, under 11 U.S.C. § 548, the Kansas Uniform Fraudulent Transfer Act,[1] and 11 U.S.C. § 547,[2] and to recover the avoided transfers under § 550.  Trial to the Court was held on April 28 and 29, 2015.  The Trustee appeared in person and by his counsel John J. Cruciani, Michael D. Fielding, and Emily G. Kaufman of Husch Blackwell LLP.  SpiritBank appeared through its corporate representative Paul Cornell and by its counsel Kenneth Wagner and Lindsay Albers of Latham, Wagner, Steele & Lehman, P.C., and Heather S. Esau Zerger of Zerger & Mauer LLP.[3]  After the conclusion of the trial, the parties submitted suggested findings of fact and conclusions of law.  Before trial, the parties had designated portions of deposition testimony they wished to present as evidence, and after they eliminated some of their designations, the record was supplemented at a hearing held on August 4, 2015, with the admissible portions of the remaining deposition testimony.

This litigation arises out of an Option Agreement that was entered into by SpiritBank and Brooke Corp on March 6, 2008.  It provided, among other things, that

---

[1] K.S.A. 33-201 to -212.

[2] Future references to sections of Title 11 in the text shall be to the section number only.

[3] Steven E. Mauer of Zerger & Mauer signed many of the briefs filed on behalf of SpiritBank.

2

Brooke Corp would purchase a $2 million CD from SpiritBank to be held by and pledged to SpiritBank to secure Brooke Corp's conditional obligation to purchase SpiritBank's participation interest in a loan to Aleritas Capital Corporation, a subsidiary of Brooke Corp. On September 4, 2008, SpiritBank liquidated the CD. On October 28, 2008, Brooke Corp filed a petition under Chapter 11 of the Bankruptcy Code. The case was later converted to Chapter 7, and Christopher J. Redmond was appointed Trustee.

On October 27, 2010, the Trustee filed a five-count First Amended Complaint, only four counts of which seek relief against SpiritBank. Count I seeks to avoid as fraudulent transfers under § 548 and the Kansas Uniform Fraudulent Transfer Act the transfers to or for the benefit of SpiritBank of money and various interests, including the Option Agreement, the purchase of the $2 million CD, and the payment of some attorney and deferral fees that total $33,000. Alternatively, Count II seeks to avoid as a § 547 preference SpiritBank's liquidation of the CD and application of the proceeds against Brooke Corp's alleged defaults under the Option Agreement. Count IV seeks recovery from SpiritBank of all avoided transfers under § 550 and K.S.A. 33-207. Count V is a claim objection cause of action seeking disallowance of SpiritBank's claim under § 502(d).

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. Further, this is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (F) and (H). In addition, the parties stipulated that the Court has jurisdiction, that the Bankruptcy Court may enter a final order, and that the law governing this proceeding is the Bankruptcy

Code and the law of the State of Kansas.[4]

## SPIRITBANK'S RULE 52(c) MOTION.

At the close of the Trustee's case, SpiritBank orally moved for a directed verdict on partial findings under Federal Rule of Civil Procedure 52(c)[5] on the basis that the Trustee had not shown that Brooke Corp had an interest in the funds used to purchase the CD. The Court declined to render any judgment until the close of the evidence. SpiritBank was granted leave to file a written motion. In that pleading, SpiritBank expanded its Rule 52(c) motion to include the contention that the Trustee had failed to prove that Brooke Corp did not receive reasonably equivalent value for the transfers. The Trustee was asked to file a response as part of his post-trial briefing.

The Court's decision to defer ruling on the motion until the close of the evidence is authorized by Rule 52(c), which includes the provision that the Court "may . . . decline to render any judgment until the close of the evidence." When it has deferred the ruling, the Court will determine the Rule 52(c) motion by evaluating the nonmovant's case, without

---

[4]Doc. 124 at 2 ¶ 2, and 4 ¶ 6.

[5] Civil Rule 52(c) is made applicable to adversary proceedings by Fed. R. Bankr. P. 7052. Rule 52(c) provides:

> **(c) Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

4

drawing any special inferences in the nonmovant's favor or concerning itself with whether the nonmovant has made out a prima facie case.[6]  "Instead, since it is a nonjury trial, the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies.  Since it is serving as the trier of fact, the court even may assess the credibility of the witnesses."[7]

In other words, when the Court defers ruling on a defendant's Rule 52(c) motion made orally at the close of the plaintiff's case until all of the evidence has been presented, the ruling on the motion and the ruling on the merits of the case fuse and become the same.  At this stage in the proceeding, the Court makes findings of fact and conclusions of law under Rule 52(a).[8]  If the motion is granted at this stage, the Court need not consider the defendant's affirmative defenses.[9]  The question here is therefore whether, given all of the record evidence and the applicable law, the Trustee has proven his case. For the reasons discussed below, the Court finds that in his case in chief, the Trustee presented  evidence sufficient to convince the Court to rule in his favor, and that this proceeding cannot be determined without considering SpiritBank's evidence in support of its defenses.  The Rule 52(c) motion is therefore denied.

---

[6] 9C Wright & Miller, *Federal Practice & Procedure: Civil 3d*, § 2573.1 at 256-259 (3d ed. 2008).

[7] *Id.* at 259-264.

[8] *Ellis v. United States Dept. of Homeland Security (In re Ellis)*, 493 B.R. 818, 825 (Bank. D. Co. 2013).  Rule 52(a) is also made applicable to adversary proceedings by Bankruptcy Rule 7052.

[9] *Domenico v. Hooser (In re Domenico )*, 2010 WL 1509499 at *7 (Bankr. D.N.M. April 14, 2010).

**TRIAL TESTIMONY AND EXPERT REPORTS.**

At trial, the Court heard the testimony of the following witnesses: Bruce Murphy, the assistant vice president of deposit operations for Generations Bank (GenBank) (formerly Brooke Savings Bank), in 2007 and 2008; Christopher J. Redmond, the Plaintiff and Chapter 7 Trustee of Debtor Brooke Corp; Carl Baronowski, Brooke Corp's general counsel beginning in September 2007 and also its senior vice-president beginning in late 2007; Paul Cornell, SpiritBank's corporate representative, who served as its deputy CEO and director in March 2008; and Jack F. Williams, SpiritBank's expert. The Court also admitted the deposition testimony of Nancy Bainbridge, SpiritBank's senior vice president of commercial loans; Albert "Kell" Kelly, CEO and president of SpiritBank; Anita Lowry, Brooke Corp's cash management manager; and Christopher J. Redmond, Brooke Corp's Chapter 7 Trustee.

Three expert reports were admitted: the Expert Report of R. Larry Johnson Regarding Insolvency of Brooke Corporation (Parent Company Only), dated July 1, 2013;[10] the Expert Report of R. Larry Johnson Regarding Insolvency of Aleritas Capital Corp. (f/k/a Brooke Credit Corporation), dated July 1, 2013;[11] and the Expert Report of Jack F. Williams, dated August 30, 2013,[12] and a supplement dated July 9, 2014,[13]

---

[10] Exh. 1 at 3-21.

[11] Exh. 1 at 22-53.

[12] Exh. VVVV.

[13] Exh. WWWW. The supplement made 6 technical corrections to the August 30, 2013 report, and supplemented the list of materials considered by adding 5 depositions. These changes are of

6

addressing the question whether Brooke Corp received reasonably equivalent value in certain transactions with SpiritBank between March and October 2008.

## FINDINGS OF FACT.

### A. BACKGROUND FACTS.

Brooke Corp and Brooke Capital filed voluntary Chapter 11 petitions on October 28, 2008. Brooke Investments filed a voluntary Chapter 11 petition about a week later. Brooke Corp, Brooke Capital, and Brooke Investments are collectively referred to as the Debtors, but this proceeding centers on Brooke Corp alone and it will be referred to as either Brooke Corp or the Debtor. At all relevant times, Robert Orr was in control of Brooke Corp, a holding company that did not earn money through operations. Brooke Corp owned approximately 62% of Aleritas, which is not a debtor under the Bankruptcy Code. On June 29, 2009, an order was entered converting the Debtors' bankruptcy proceedings to Chapter 7. Christopher J. Redmond is the Debtors' Chapter 7 Trustee.

The Trustee and SpiritBank stipulated that Debtor Brooke Corp and Aleritas were continuously insolvent for purposes of §§ 544, 547, and 548 and the Kansas Uniform Fraudulent Conveyance Act during all time periods relevant to this adversary proceeding. R. Larry Johnson's expert report regarding the insolvency of Brooke Corp concludes that Brooke Corp was insolvent from December 31, 2005, and thereafter, with its negative equity growing from approximately $65.1 million on December 31, 2005, to over $158

_____

tangential importance to Mr. Williams's report and therefore are not discussed in the Court's analysis of the report.

million by the petition date.[14]  Johnson's expert report regarding the insolvency of

Aleritas concludes that Aleritas was insolvent from December 31, 2005, and thereafter,

with its negative equity growing from approximately $36.6 million on December 31,

2005, to $76.5 million as of December 31, 2007, and growing beyond that during 2008.[15]

The outside world and most of Brooke's senior management were not aware of the

insolvencies of Brooke Corp and its related companies.  Aleritas's stock continued to be

publicly traded during all times relevant to this proceeding.

### B. THE TRANSACTIONS.

By a Note and Warrant Purchase Agreement (NWPA) dated October 31, 2006,

Brooke Credit Corporation (later known as Aleritas) obtained approximately $45 million

in secured financing from entities commonly referred to as Falcon-Jordan.[16]  The interest

rate was 12%,  and the notes that were issued (the Falcon-Jordan Notes) were due on

April 30, 2013.  The definition and consequences of a Mandatory Repurchase Event

under the NWPA are critical matters in this controversy.  Mandatory Repurchase Event is

defined in Exhibit B of the NWPA as follows:

> "**Mandatory Repurchase Event**" shall mean the
> occurrence of any one of any of the following events:  (i) as to
> the Parent [Brooke Corp], the occurrence of any one of any of
> the following events:  (a) either of Robert Orr or Leland

---

[14] Exh. 1 at 10-11.

[15] Exh. 1 at 44-47.

[16] Exh. 32.  The NWPA called for Brooke Credit Corporation to issue a separate note and a separate warrant to each entity that agreed to purchase an interest in the NWPA.

Orr . . . ceases to own and control 80% of the Capital Stock of the Parent owned thereby on the Closing Date, . . . ; (b) any of Michael Lowry, Shawn Lowry and Anita Larson . . . ceases to own and control 80% of the Capital Stock of the Parent owned thereby on the Closing Date . . . ; or (c) if Robert Orr, Leland Orr, Michael Lowry, Kyle Garst, Shawn Lowry and Anita Larson collectively ceases [sic] to possess the power . . . to direct or cause the direction of the management or policies of the Parent . . . , (ii) Persons who constitute the Parent's Governing Body on the date hereof cease for any reason other than in the ordinary course . . . to constitute at least a majority of the Governing Body of the Parent, (iii) . . . the Parent ceases to own and control . . . eighty percent (80.0%) of the Capital Stock of the Company owned thereby on the Closing Date; (iv) the Parent fails to own . . . one hundred percent . . . of the membership interests in Brooke Agency Services Company LLC or . . . seventy five percent . . . of the Capital Stock of Brooke Franchise Corporation . . . , (v) prior to the consummation of a Qualified Public Offering, the Parent ceases to own and control . . . at least fifty-one per cent . . . of the Capital Stock of the Company [Brooke Credit Corporation] . . . , (vi) after the consummation of a Qualified Pubic Offering, the Parent ceases to own and control . . . at least forty percent . . . of the Capital Stock of the Company . . . , (vii) Persons who constitute the Company's Governing Body on the date hereof cease for any reason other than in the ordinary course . . . to constitute at least a majority of the Governing Body of the Company, (viii) the Company fails to own at any time one hundred percent . . . of the Capital Stock of any Subsidiary thereof . . . , (ix) the Company fails to own at any time one hundred percent . . . of the Capital Stock of any SPE, (x) the Governing Body of the Company, shall approve [a merger, a sale or transfer of substantially all assets, and any plan of liquidation], or (xi) . . . any Person . . . acquires the ability to elect a majority of the Governing Body of the Company.[17]

The occurrence of a Mandatory Repurchase Event is one of nineteen Events of

---

[17] Exh. 33 at 13-14.

Default stated in § 8.1 of the NWPA.[18]  Other Events of Default include a payment

default by Aleritas, a breach of the NWPA covenants, the rendering of a judgment against

Aleritas in excess of $200,000, the filing of a notice of a lien on any material portions of

Aleritas's property, and the insolvency of Aleritas.  As to a Mandatory Repurchase Event,

section 3.1(b) of the NWPA provides that Aleritas shall give the note-holders notice and

an offer to purchase the notes five business days prior to the occurrence of *any* Mandatory

Repurchase Event.  The section also provides that if Aleritas "does not purchase the

Notes in connection with the occurrence of a Mandatory Repurchase Event *with respect*

*to the Parent*, within the time period provided herein, then the Parent [Brooke Corp] shall

be obligated hereunder to promptly purchase the Notes on the terms set forth herein."[19]

This is the only provision of the NWPA imposing liability on Brooke Corp.

On February 9, 2008, Aleritas and Falcon-Jordan entered into a Note Repurchase

Agreement with respect to the NWPA, defining the terms of "a mutually acceptable wind-

up of their relationship."[20]  Aleritas agreed to raise the funds necessary to repurchase the

Falcon-Jordan Notes by paying $46,679,850, plus interest accrued to the closing date.

Brooke Corp was not a party to the agreement, although Brooke Corp, parent of Aleritas,

was included in the broad mutual releases of all claims of the parties.

On March 6, 2008, Aleritas entered into a loan agreement (the FSB Loan) with

[18] Exh. 32 at 44-47.

[19] Exh. 32 at 5 (emphasis supplied).

[20] Exh. 34.

First State Bank of Gothenberg, Nebraska (FSB), to borrow up to $52,500,000 to provide funds to refinance the Falcon-Jordan Notes. FSB sold participation interests in the FSB Loan. SpiritBank initially declined to purchase an interest because the pledge of residual income as collateral to secure the FSB Loan was against SpiritBank's loan policies. Brooke Corp approached SpiritBank with a proposal for a secured Option Agreement to induce SpiritBank to become a $10 million participant, which it agreed to do. By March 7, 2008, $41,250,000 (which includes SpiritBank's $10 million) of the $52,500,000 FSB Loan was subscribed. Aleritas provided an additional $14 million, and the refinance of the Falcon-Jordan Notes closed.

None of the events constituting a Mandatory Repurchase Event, as to the parent (Brooke Corp) or otherwise, were declared to have occurred while the NWPA was in effect. Falcon-Jordan never provided written notice to Aleritas declaring the Falcon-Jordan obligations to be due and payable. But Carl Baranowski, general counsel of Brooke Corp, testified that in his opinion, Falcon-Jordan could have declared a default at any time because of Aleritas's double pledge of some collateral. The Trustee testified that his examination of Brooke's records revealed no written notice from Falcon-Jordan of a default under the NWPA, no written notice from Falcon-Jordan demanding a repurchase of the Falcon-Jordan Notes, and no declaration from Falcon-Jordan that a change of control had occurred.

The March 6, 2008 Option Agreement between Brooke Corp and SpiritBank defined the terms and conditions for SpiritBank's purchase of a $10 million interest in the

11

FSB Loan.[21]  It included a take-out option to be exercised by SpiritBank on or before April 21, 2008, by giving notice to Brooke Corp of SpiritBank's desire to sell its participation interest.  If the option was exercised and a sale to a third party did not close within 45 days after notice, Brooke Corp agreed to become a sub-participant in the FSB Loan in place of SpiritBank by paying SpiritBank the agreed purchase price.  Brooke Corp's purchase obligation was secured by a first-priority lien in 2,500,000 shares of Brooke Corp's stock in Aleritas and a $2 million certificate of deposit (the Brooke CD) to be held in the name of Brooke Corp at SpiritBank.  Pursuant to paragraph 5 of the Option Agreement, Brooke Corp agreed to deposit additional cash collateral "in the amount of such deficiency" with SpiritBank if the value of the pledged stock dropped below $10 million.

Paragraph 3 of the Option Agreement, which defines Brooke Corp's obligations if SpiritBank exercises its take-out option, is titled Brooke's Secured Guaranty.  It  provides that the paragraph "shall be interpreted and enforced as a Guaranty of payment and performance of the obligations hereunder which guaranty shall be enforceable by SpiritBank in any court of competent jurisdiction."  Nancy Bainbridge testified that the purpose of the Brooke CD was "to secure the guaranty of Brooke Corporation."[22] SpiritBank documents and e-mails between SpiritBank employees refer to the Option

---

[21] Exh. 2.

[22] Nancy Bainbridge depo. dated June 17, 2014, at 60:6-17.

Agreement as a guaranty.[23]  Paul Cornell of SpiritBank e-mailed Albert Riederer, the

original Chapter 11 Trustee of the Debtors, on October 1, 2008, stating that "we have an

option agreement that amounts to a guaranty from Brooke Corp."[24]

To purchase the Brooke CD, $2 million was wired on March 7, 2008, to

SpiritBank from Brooke Corp's operating account, Account No. *0913 at GenBank,

which had a balance of $2,161.37 as of the close of business on March 6, 2008.[25]  At trial,

Bruce Murphy, an assistant vice president for GenBank at the time, explained how this

transaction took place.  In response to an e-mail request by Anita Lowry, the $2 million

wire transfer was initiated at approximately 1:57 p.m. and completed by approximately

2:02 p.m.[26]  The transfer left Account No. *0913 with an overdraft balance of negative

$1,997,838.63.[27]  An overdraft could occur only if approved by a GenBank loan officer,

and the $2 million transfer was so approved.  The transfer to SpiritBank was reflected as a

reduction in GenBank's cash reserve account at the Federal Reserve Bank.  At 4:21 p.m.

on March 7, 2008, the same day the funds were sent to SpiritBank, $2,005,000 was

transferred into Brooke Corp's Account No. *0913 from Account No. *0638 at GenBank,

---

[23] *E.g.*, exhs. 12, 13, & 15.

[24] Exh. 24.

[25] *See* exh. 40 at 1.

[26] *See* exh. 43 at 1.

[27] *See* exh. 40 at 1.

13

in the name of Brooke Capital Corp.[28]  Brooke Capital acquired the funds to make the transfer to cure the overdraft by a $500,000 transfer from Account No. *0751, in the name of Brooke Franchise Corporation, and a $1,500,000 transfer from Account No. *0646, in the name of Brooke Capital Advisors.  From the time that $2 million for purchase of the CD was received by SpiritBank on March 7, 2008, until the CD was liquidated on September 4, 2008, the Brooke CD was continuously on deposit with SpiritBank and subject to the pledge by Brooke Corp.

Carl Baranowski testified that the purchase of the $2 million CD was intended to be funded with "a move [of funds] from Brooke Credit [Aleritas] to Brooke Corp."[29]  The record contains a promissory note in the amount of $2 million dated March 3, 2008, that identifies Aleritas as the lender and Brooke Corp as the borrower.[30]  SpiritBank contends this note shows that the Brooke CD was purchased with funds belonging to Aleritas.  However, Baranowski testified that he believes the note was backdated.[31]  An e-mail message dated March 28, 2008, raising the need to document the loan, and responses discussing such a note, confirm this belief.[32]  Bank records show a transfer of $2 million from Aleritas to Brooke Corp on March 11, 2008, but this transfer was reversed on March

---

[28] *See* exh. 44 at 14.

[29] Tr. vol. II at 5:6-12.  All references in this opinion to the trial transcript are to docs. 182 and 183.  A later-filed, corrected transcript was not available in time to be cited herein.

[30] Exh. S.

[31] Tr. vol. II at 36:11-16.

[32] Exh. UUU.

14

12.[33]  Another $2 million transfer was made by Aleritas to Brooke Corp on March 19, 2008, that was not reversed.[34]

When agreeing to the Option Agreement, SpiritBank did not envision that it would exercise the take-out option.  But on April 11, 2008, SpiritBank timely exercised its take-out option because it had a few unanswered questions, even though it thought everything would be fine.[35]  By April 21, 2008, because the value of the stock pledged to SpiritBank had declined below $10 million, Brooke Corp was required by the Option Agreement to deposit additional cash collateral with SpiritBank.  On April 21, 2008, Brooke Corp and SpiritBank entered into an Amendment of Option Agreement under which Brooke Corp agreed to deposit an additional $1,521,734 with SpiritBank no later than April 30, 2008.[36]  It is uncontroverted that this money was not given to SpiritBank.  A Second Amendment to Option Agreement, dated July 1, 2008, extended the take-out date to October 10, 2008.  It obligated Brooke Corp to pay a deferral fee of $25,000 and attorneys' fees totaling $8,000 (collectively the Deferral Fees), which Brooke Corp did pay on June 30, 2008.  SpiritBank became concerned by July 31, 2008, because Aleritas was in default of its July payment on the FSB loan, and Brooke Corp had not delivered

---

[33] Tr. vol. II at 148:19 to 149:2.

[34] Tr. vol. II. at 148:3 to 149:11.

[35] Nancy Bainbridge depo. dated June 17, 2014, at 93:21 to 95:2.

[36] Exh. 5.

15

the additional cash collateral.[37]  On September 4, 2008, SpiritBank cashed the Brooke

CD, which had continuously been in SpiritBank's possession since its purchase, receiving

$2,012,491.67.[38]  A Third Amendment to Option Agreement, dated September 10, 2008,

extended the take-out date to February 17, 2009.[39]

### C.  THE BONY LITIGATION, BROOKE CORP'S BANKRUPTCY, AND SPIRITBANK'S PROOF OF CLAIM.

On September 11, 2008, Bank of New York Mellon (BONY), as a trustee under

certain indentures, filed suit in the United States District Court for the District of Kansas

against Aleritas, Brooke Corp, and other Brooke entities alleging fraudulent conduct and

misappropriation of funds pledged to note-holders under certain securitizations, and the

spoliation of evidence to conceal these actions.[40]  BONY prayed for the appointment of a

receiver of the defendants' businesses.  By an agreement of the parties that was approved

by the court, Albert Reiderer was appointed as a Special Master, with the power to

control the operations of the Brooke entities.

Brooke Corp filed a petition under Chapter 11 on October 28, 2008.  SpiritBank

filed a proof of claim for $7,583,967.11 under the Option Agreement as amended.[41]  If

SpiritBank had not liquidated the Brooke CD, the amount it claimed would have been

---

[37] Bainbridge depo. at 162:4-11; Exh. 20 at 2.

[38] *See* exh. 7 at 2; exh. 27; Tr. vol. II at 55:10-20; Doc. 170 at 9; Doc. 171 at 21.

[39] Exh. 7.

[40] *Bank of New York Mellon v. Aleritas Capital Corp.*, D. Kan. Case no. 08-cv-2424.

[41] Exh. 28.

16

approximately $9.6 million. Its receipt of the $2.012 million from cashing the Brooke CD therefore constitutes a payment of about 21 percent of the $9.6 million, which is more than the Trustee expects to be able to distribute to the Debtor's unsecured creditors.[42]

## D. TESTIMONY REGARDING REASONABLY EQUIVALENT VALUE.

Jack F. Williams, SpiritBank's expert witness, opined in his report that "the direct and indirect benefits received by Brooke Corp [in its transactions with SpiritBank] constitute substantial value that is reasonably equivalent to the obligations incurred and interests in property transferred to SpiritBank."[43] In the report, he identified the following as obligations Brooke Corp incurred and property it transferred with respect to the Option Agreement: (1) the obligation to purchase SpiritBank's participation interest if SpiritBank exercised the take-out option; (2) through its guaranty, the obligation to pay the purchase price upon SpiritBanks' exercise of the option; (3) the conditional obligation to provide additional cash collateral if the pledged stock decreased in value by a specified amount; (4) the grant of a first priority security interest in shares of Aleritas owned by Brooke Corp; and (5) the grant of a first priority security interest in a $2 million CD.[44] Mr. Williams identified the following as benefits Brooke Corp received under the Option Agreement: (1) the benefit to Aleritas, and therefore to Brooke Corp as its majority owner, of decreasing Aleritas's interest expense by retiring the 12% Falcon-Jordan Notes;

---

[42] Tr. vol. I. at 190: 4-10.

[43] Exh. VVVV at 47.

[44] Exh. VVVV at 31-32.

17

(2) the benefit to Brooke Corp from replacing the mandatory repurchase obligation (the repurchase price was approximately $51.75 million) in the NWPA with the $10 million take-out obligation; and (3) a benefit to Brooke Corp from the opportunity to retire the Falcon-Jordan Notes outside of the contractual prepayment window at a reduced premium.[45]  He also identified value Brooke Corp received from the amendments to the Option Agreement, pursuant to which Brooke Corp transferred $33,000 to SpiritBank, as follows:  (1) the benefit from SpiritBank's acceptance of alternative forms of collateral in lieu of cash collateral; (2) several extensions of the closing date for Brooke Corp's obligation to purchase SpiritBank's interest in the FSB Loan; and (3) the deferral of the exercise of SpiritBank's right to realize on its collateral.[46]  Mr. Williams's written report did not assign a value to either the benefits he claimed Brooke Corp received from or the obligations it assumed under the Option Agreement.

When testifying, Mr. Williams supplemented his report.  He stated he had concluded that "it was at least more likely than not, approaching highly likely," that one of the events listed in subsections (a)(i)(c), (iii), and (iv) of the definition of Mandatory Repurchase Event in Exhibit B to the NWPA (quoted above) would trigger Brooke Corp's repurchase obligation during the term of the Falcon-Jordan Notes.[47]  Later in his

---

[45] *Id*. at 32.

[46] *Id*. at 47.

[47] Tr. vol. II at 161:11 to 162:5.

18

testimony, he assigned a value of 70 to 80% to that likelihood.[48]  He testified he had five

reasons for concluding that a Mandatory Repurchase Event was that likely, but they are

difficult to identify in his testimony.  They appear to relate to the facts and circumstances

which led to an SEC investigation and to the BONY litigation; the commingling of cash

from different Brooke entities and the movement of money from one entity to pay the

obligations of another; questions about the honesty of Robert Orr, who controlled the

Brooke companies; questions of gross mismanagement of funds and assets; and the

potential for many fraudulent conveyances.[49]  He concluded it was more likely than not

that SpiritBank would exercise the take-out option under the Option Agreement, but less

likely than the occurrence of a Mandatory Repurchase Event.[50]  Based upon these

considerations, he concluded that Brooke Corp received reasonably equivalent value in

the Option Agreement.[51]  He testified, "And then I cross-validated . . . which also meant

on a $51 million liability with a $2 million pledge of a $10 million replacement

obligation, a probability of the contingency and the mandatory repurchase of anywhere

between 3 or 4 percent, gets you to $2 million.  In other words, you would have to be over

96 percent sure that it wasn't going to happen before you even start to reduce the

obligation below the $2 million CD in this case.  And that's giving the hundred percent

---

[48] Tr. vol. II at 75:9-13.

[49] Tr. vol. II at 164:13 to 167:1.

[50] Tr. vol. II at 175:22 to 176:3.

[51] Tr. vol. II at 175:22 to 176:21.

19

value to Brooke Corporation and its interest in the CD that it pledged here."[52]  But in his testimony, as in his written report, Mr. Williams did not determine the monetary value of either the benefit or the detriment to Brooke Corp.

Mr. Williams also opined that Brooke Corp was not the economic source of the $2 million transferred to SpiritBank to purchase the Brooke CD because:  (1) Brooke Corp was a holding company and did not receive funds as the result of operations; and (2) the source of funds appeared to be non-Debtor Brooke depositors at GenBank or a loan from Aleritas.

Mr. Williams's report did not mention the insolvency of Brooke Corp and Aleritas, to which SpiritBank stipulated, as factors in his analysis.  Although Mr. Williams acknowledged when testifying that he is the author of published commentary questioning the presumption that a parent company's downstream guaranties always provide reasonably equivalent value to the parent, he stated that there was no need to amend his expert report, which addressed whether Brooke Corp (the parent) received reasonably equivalent value when it guaranteed the obligation of Aleritas (its subsidiary).  Mr. Williams's report also did not address the impact, if any, on the determination of reasonably equivalent value of the circumstance that Brooke Corp owned only 62% of the stock of Aleritas, or the impact of the fact that SpiritBank's purchase of the $10 million participation interest was not the sole transfer that made the payoff of the Falcon-Jordan Notes possible.

---

[52] Tr. vol. II at 176:22 to 177:9.

Christopher J. Redmond testified that his investigation as Trustee has not revealed any benefits or assets that Brooke Corp received in conjunction with SpiritBank's participation in the FSB Loan to Aleritas.[53]  In his view, as a result of the Option Agreement with SpiritBank, the value of Aleritas was reduced by the transfer of $14 million in cash to Falcon-Jordan and the value of Brooke was reduced by the transfer of $2 million in cash to SpiritBank.

Carl Baranowski testified that the refinancing of the Falcon-Jordan Notes was important to Brooke Corp for two reasons.[54]  First, it avoided the possibility of Falcon-Jordan declaring a default which would have constituted a material event for Aleritas and required the filing of a report with the Securities and Exchange Commission.  Such a filing would have resulted in a decrease in the value of Aleritas's stock, and therefore a loss in value to Brooke Corp, its parent.  Second, the refinancing released Brooke Corp from a negative pledge agreement which prevented it from using its interest in Aleritas as collateral with other creditors.  The Court finds the testimony regarding the negative pledge agreement was too vague for the Court to accept Mr. Baronowski's second reason.  A negative pledge agreement dated October 31, 2006, is not in the record, although it is mentioned  in a report prepared by Brooke's outside counsel[55] and in the NWPA.[56]  There

---

[53] Tr. vol. II at 48:17 to 49:5.

[54] Tr. vol. II at 21:7 to 22:3.

[55] Exh. CCCCC at 13.

[56] Exh. 32 at 27, § 5.1(a)(xv).

21

is no evidence about the parties to the agreement, the stock to which it applied, the restrictions it imposed, or its relationship to the collateral pledged to secure the NWPA and the Option Agreement. SpiritBank's expert did not identify a release from a negative pledge agreement as a benefit to Brooke Corp resulting from the payoff of the Falcon-Jordan Notes.

## DISCUSSION AND CONCLUSIONS OF LAW.

## A. THE FRAUDULENT TRANSFER CLAIM.

### 1. Section 548 in general.

Under § 548, the Trustee seeks to avoid as constructively fraudulent the transfers to or for the benefit of SpiritBank, including the Option Agreement, the purchase and pledge of the Brooke CD, and the payment of the Deferral Fees of $33,000. According to § 548:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
> . . .
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

"Section 548 and fraudulent transfer law generally attempt to protect creditors from transactions which are designed, or have the effect, of unfairly draining the pool of assets available to satisfy creditors' claims, or which dilute legitimate creditor claims at

22

the expense of false or lesser claims."[57]  Section 548 covers two classes of transactions.

"The first class of improper transactions — those  made with actual intent — have been

condemned for over 450 years."[58]  In the second class, the "unfairness stems from a

disparity of exchange coupled with the debtor's lack of other assets."[59]  "In these cases,

fraud is presumed."[60]

Both transfers of interests in property and the incurrence of obligations may be

avoided.  "[I]f the court avoids an obligation under section 548 . . . , transfers made by the

debtor on account of that obligation are not made for reasonably equivalent value, and

may be set aside as actually or constructively fraudulent if the other requirements for

actual or constructive fraud are met."[61]  For example, prepetition payments made by a

debtor pursuant to a guaranty of the debt of a liquidated affiliate can be recovered by the

trustee where the debtor did not receive reasonably equivalent value for the guaranty.[62]

Although most of the testimony in this case focused on the purchase and pledge of

---

[57] 5 *Collier on Bankruptcy*, ¶ 548.01[1][a] at 548-11 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2015).

[58] *Id.*, ¶ 548.01 at 548-10.

[59] *Id.*

[60] *Id.* at 548-11.

[61] *Id.*, ¶ 548.03[4][a] at 548-50 (citing *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest., Inc.),* 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) ("[I]f the Guaranty is avoided as a fraudulent obligation, it cannot serve as 'fair consideration' for the subsequent Transfers.")).

[62] *Leibowitz v. Parkway Bank & Trust (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 576-82 (7th Cir. 1998).  *See also Samson v. Western Capital Partners, LLC (In re Blixseth)*, 514 B.R. 871, 884-85 (D. Mont. 2014) (where debtor's guaranty of debts of her son's businesses was set aside as fraudulent conveyance, trustee was entitled to recover all funds lender received by enforcing guaranty).

23

the $2 million CD, the Trustee's fraudulent transfer action includes both transfers of property and the incurrence of obligations. With respect to transfers of property, he seeks to avoid the transfer of the Brooke CD and the payment of the Deferral Fees in conjunction with the Second Amendment to Option Agreement. In addition, with respect to obligations the Debtor incurred, the Trustee seeks to avoid the Option Agreement as a constructively fraudulent transfer. In order to prevail, he must establish that (1) the transfers were made or the obligations under the Option Agreement were incurred (2) less than two years before the Debtor's bankruptcy petition was filed (3) without the receipt in return of something with a reasonably equivalent value (4) while the Debtor was insolvent.[63] The Trustee has the burden to prove the elements by a preponderance of the evidence.[64] The parties agree that the transfers occurred and the Debtor's obligations were incurred under the Option Agreement less than two years before the Debtor's bankruptcy petition was filed and that the Debtor was insolvent at that time. The controversy is about two elements: (1) whether the funds transferred to purchase the Brooke CD were property of the Debtor and (2) whether the Debtor received reasonably equivalent value for transferring the CD and incurring the obligations under the Option

---

[63] Similarly, to prevail on the contention that the Brooke CD was an interest in property fraudulently conveyed to SpiritBank (considered as a transfer of property independent of the allegedly voidable Option Agreement), the Trustee must establish that (1) the Debtor had an interest in the CD that was transferred to SpiritBank (2) less than two years before the Debtor's bankruptcy petition was filed (3) without the receipt in return of something with a reasonably equivalent value (4) while the Debtor was insolvent.

[64] *Wessinger v. Spivey (In re Galbreath)*, 286 B.R. 185, 197 (Bankr. S.D. Ga. 2002)*; see also Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593 (11th Cir. 1990).

24

Agreement.

### 2. Brooke Corp had an interest in the funds used to purchase the Brooke CD.

SpiritBank's initial defense is that the Trustee may not avoid the September 4, 2008 transfer of the Brooke CD to SpiritBank because, as a matter of law, Brooke Corp had no "interest" in the CD, as required for avoidance under either § 547 or § 548. The Trustee has the burden to prove that the Debtor had an interest in the CD.

The Trustee has satisfied that burden by evidence showing that the CD was purchased using funds sent to SpiritBank by a wire transfer from account number *0913 at GenBank, Brooke Corp's operating account. The Trustee relies on the dominion or control test when arguing that Brooke Corp had an interest in the funds transferred, but SpiritBank contends the dominion or control test is inapplicable. Assuming the dominion or control test does not apply, SpiritBank then asserts that the funds transferred to purchase the SpiritBank CD were not the property of Brooke Corp for three reasons: (1) since Brooke Corp had insufficient funds in its operating account when the transfer was made, the funds wired were actually from GenBank's account at the Federal Reserve Bank; (2) the funds were provided by Brooke Capital and Brooke Franchise Advisors; and (3) Aleritas loaned the funds to Brooke Corp.

To answer the question whether Brooke Corp had an interest in the funds transferred to SpiritBank to purchase the CD, the Court need look no further than the decision of the Tenth Circuit Court of Appeals in *Marshall*.[65]  In that case, the Chapter 7

---

[65] *Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251 (10th Cir. 2008).

trustee brought an adversary action to set aside alleged preferential transfers occurring when the debtors took advantage of an offer by one credit card company (Capital One) to pay the balance on the debtors' MBNA credit card account. Defendant MBNA contended that no "interest of the debtors in property" was transferred, as required by § 547(b). Both the bankruptcy court and the district court had concluded that the transfers did not involve an interest of the debtors in property, but the Tenth Circuit disagreed. It held that "a transfer of property will be a transfer of 'an interest of the debtor in property' if the debtor exercised dominion or control over the transferred property."[66] The Circuit reasoned that the credit-card-company-to-credit-card-company transfer was "essentially the same as if Debtors had drawn on their Capitol One line of credit, deposited the proceeds into an account within their control, and then wrote a check to MBNA."[67] The debtors' fleeting interest in the loan proceeds was sufficient. Since the borrowed funds had been an asset of the estate "for at least an instant" before they were preferentially transferred as directed by the debtors, the estate was diminished by the transfer.[68] Section 548(a)(1), like the portion of § 547(b) that was at issue in *Marshall*, uses the phrase "interest of the debtor in property." Because identical words or phrases used in the same

---

[66] *Id*. at 1255.

[67] *Id*. at 1256.

[68] *Id*. at 1258. Strictly speaking, the bankruptcy estate did not exist at the time of the transfer because the debtors had not yet filed bankruptcy, but the Circuit recognized the question was "whether the loan proceeds 'would have been part of the estate had [they] not been transferred before the commencement of bankruptcy proceedings.'" *Id*. (*quoting Begier v. IRS*, 496 U.S. 53, 58 (1990)).

26

act bear the same meaning, the *Marshall* analysis is controlling here.[69]

Brooke Corp directed a wire transfer from its operating account at GenBank to SpiritBank for the purpose of purchasing the Brooke CD, as required under the Option Agreement. There is no question that Brooke Corp had control over the account. The fact that the wire transfer was accomplished by a transfer from GenBank's account at the Federal Reserve and created a daylight overdraft because it placed Brooke Corp's account in a not sufficient funds (NSF) position[70] is immaterial for purposes of determining whether Brooke Corp transferred an "interest of the debtor in property." Most checks are processed using a bank's account at the Federal Reserve, whether or not an NSF position is created.[71] If the NSF position had resulted in an overdraft because the position was not timely covered, GenBank's payment of that overdraft would have created a loan or extension of credit by the bank to Brooke Corp.[72] *Marshall* holds that a transfer of borrowed funds, however fleetingly held by the debtor, constitutes a transfer of the debtor's interest in the money.[73]

---

[69] *Enfield ex rel. Enfield v. A.B. Chance Co.*, 228 F.3d 1245, 1251 (10th Cir. 2000) (*citing Estate of Cowart v. Nichlos Drilling Co.*, 505 U.S. 469, 479 (1992)).

[70] *See Jacobs v. State Bank of Long Island (In re AppOnline.com, Inc.)*, 296 B.R. 602, 617-18 (Bankr. E.D.N.Y. 2003) (*quoting In re Chase & Sanborn Corp.*, 848 F.2d at 1197-98).

[71] 296 B.R. at 608.

[72] *Nat'l Bank of Andover v. Kansas Bankers Sur. Co.*, 290 Kan. 247, 270, 225 P.3d 707, 723 (2010).

[73] *Marshall*, 550 F.3d at 1257.

SpiritBank attempts to distinguish *Marshall*.[74]  But the fact that *Marshall* involved a balance transfer from one credit card company to another and this case involves a wire transfer that created a daylight overdraft makes no difference.  Broadly speaking, this case, like *Marshall*, involved unsecured credit.  The Court rejects the suggestion that unlike the debtors in *Marshall*, Brooke Corp did not direct the disposition of the funds. Brooke Corp directed the transfer of $2 million from its account to SpiritBank; it controlled the transfer of the funds that SpiritBank received.  Whether Brooke Corp was the economic source of the funds is immaterial; it had control of the funds and that is all that matters.  Also like *Marshall*, in this case the funds advanced to cover the NSF position belonged to the Debtor for just an instant.  A debtor's "discretionary use of borrowed funds" is a use of property in which the debtor has an interest.[75]  The transfer diminished the bankruptcy estate that was created when the Debtor later filed its bankruptcy petition.

After arguing that *Marshall* does not apply to this case, SpiritBank presents what it apparently views as a defense not controlled by *Marshall* — that the Trustee may not recover because the $2 million transferred was not the property of Brooke Corp.  This defense builds upon Mr. Williams's opinion that Brooke Corp was not "the funding source of the $2 million used to purchase the $2 million CD."[76]  The argument focuses

---

[74] Doc. 168 at 2-6.

[75] *Marshall*, 550 F.3d at 1257.

[76] Exh. VVVV at 34.

28

upon from whom Brooke Corp acquired the funds to cover the NSF position that was created when the $2 million was wired to SpiritBank to purchase the CD. But *Marshall* renders the source of the funds irrelevant since Brooke Corp controlled the transfer, from whatever source. The fact that the transfer was funded from GenBank's account at the Federal Reserve is not relevant. Even if there had been no daylight overdraft, the wire transfer would not have been accomplished by a direct transfer from Brooke Corp to SpiritBank. A wire transfer "is a series of transactions. With the completion of each payment order, a bank becomes obligated to pay funds to the next link in the chain, culminating with the duty of the beneficiary's bank to pay the beneficiary."[77]

For the foregoing reasons, the Court rejects SpiritBank's defense that the Trustee has failed to prove that the funds used to purchase the Brooke CD were property in which the Debtor had an interest, as required under § 548(a)(1).

### 3. Reasonably Equivalent Value.

#### a. The law on determining reasonably equivalent value.

"An examination into reasonably equivalent value includes three inquiries: (1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received."[78] "In determining 'reasonably equivalent value,' courts typically compare the

---

[77] Barkley Clark and Barbara Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 17.01 (A.S. Pratt & Sons, current through Oct. 2013 update) (available on WestlawNext).

[78] *LTF Real Estate Co., Inc. v. Expert South Tulsa, LLC (In re Expert South Tulsa, LLC)*, 522 B.R. 634, 652 (10th Cir. BAP 2014).

29

value of the property transferred with the value of what the debtor received."[79]  Section 548(d)(2)(A) defines "value" to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor."

"The date for defining . . . reasonable equivalence is the date of the transfer."[80] "Subsequent events should not affect whether reasonable value was given."[81]  For example, the value of a gambling wager is measured by its value when the bet is placed, not when the gambler leaves the casino with nothing.[82]  "The existence of risk is not itself determinative of value.  Instead, it is simply a factor to be considered when weighing the relative worth of what the debtors acquired."[83]  Likewise, a  contingent liability is not "valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the liability become real.'"[84]  In this case, both the alleged direct benefit to Brooke Corp from satisfaction of the NWPA and the obligations Brooke Corp assumed under the Option Agreement are at least in part contingent.

---

[79] *White v. Coyne, Schultz, Becker & Bauer, S.C. (In re Pawlak)*, 483 B.R. 169, 183 (Bankr. W.D. Wis. 2012).

[80] *Cooper v. Ashley Commc'ns., Inc. (In re Morris Commc'ns NC, Inc.),* 914 F.2d 458, 466 (4th Cir. 1990) (*citing Collier on Bankruptcy*, § 548.09 at p. 116 (15th ed. 1984)).

[81] *In re Pawlak*, 483 B.R. at 185.

[82] *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 770-71 (6th Cir. 1995).

[83] *In re Pawlak*, 483 B.R. at 186.

[84] *In re Chase & Sanborn*, 904 F.2d at 594 (*quoting In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988)).

30

"As a general rule, obligations incurred by a debtor solely for the benefit of a third party are treated as not supported by a reasonably equivalent value."[85]  In other words, a "payment made solely for the benefit of a third party, such as a payment to satisfy a third party's debt, does not furnish reasonably-equivalent value to the debtor."[86]  An exception to this rule "has been recognized where a debtor receives an indirect benefit from paying or guaranteeing the obligation of a third party."[87]  The Court will therefore analyze the value Brooke Corp allegedly received by separately examining the direct and indirect benefits.  If the Trustee proves the absence of a direct benefit to the Debtor, the burden then shifts to SpiritBank to show the Debtor received an indirect benefit.[88]

In this case, the Trustee contends that Brooke Corp did not receive a benefit of a value reasonably equivalent to the value of the obligations it incurred under the Option Agreement.  SpiritBank contends that Brooke Corp received value from the satisfaction of the Falcon-Jordan Notes and that the value was reasonably equivalent to the value of Brooke Corp's obligations to SpiritBank.  This defense is based upon the unexamined proposition that the retirement of the Falcon-Jordan Notes was done in "exchange" for the execution of the Option Agreement, as required by § 548(a)(1)(B).  Although the Trustee

---

[85] *Tourtellot v. Huntington Nat'l Bank (In re Renegade Holdings, Inc.)*, 457 BR. 441, 444 (Bankr. M.D.N.C. 2011).

[86] *Osherow v. Nelson Hensley & Consol. Fund Mgmt., L.L.C. (In re Pace)*, 456 B.R. 253, 271 (Bankr. W.D. Tex. 2011) (*quoting In re Whaley*, 229 B.R. 767, 775 (Bankr. D. Minn. 1999)).

[87] *In re Renegade Holdings*, 457 BR. at 444.

[88] *First Nat'l Bank v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 417-19 (D. Minn. 1990).

31

does not question that proposition, the Court observes that the Option Agreement concerned only a $10 million participation interest in the FSB Loan. The Falcon-Jordan Notes were retired in exchange for $14 million provided by Aleritas and $41.5 million in proceeds from the FSB Loan, which included the $10 million interest of SpiritBank. Thus, the Option Agreement facilitated the acquisition of only 18% of the payoff amount. The Court has found no case law addressing whether this attenuated "exchange" is sufficient for purposes of § 548(a)(1)(B), and, if so, how determinating the possible equivalency of the value of the exchanged items may be affected. Therefore, the Court's analysis is not colored by this possible problem with SpiritBank's position.

### b. When executing the Option Agreement on March 6, 2008, did Brooke Corp receive a direct value reasonably equivalent to the value of the obligations it assumed?

The Trustee testified that he knew of no value or assets Brooke Corp received as a result of entering into the Option Agreement. The proceeds of SpiritBank's $10 million participation interest in the FSB Loan went to Aleritas, not Brooke Corp. Aleritas used these proceeds, together with other funds, to satisfy the Note Repurchase Agreement with the Falcon-Jordan parties. The interest rate Aleritas, not Brooke Corp, had to pay on borrowed funds was reduced.

The Option Agreement imposed liabilities upon Brooke Corp. SpiritBank obtained the right to give Brooke Corp notice of its desire to sell its $10 million participation interest on or before April 21, 2008, for the balance owed on its participation at the time of sale. If a third-party did not complete the purchase, Brooke Corp was

32

obligated to do so. Brooke Corp provided security for its obligation to buy SpiritBank's interest, a lien on 2,500,000 shares of Brooke Corp's stock in Aleritas and a lien on a $2 million CD. In addition, Brooke Corp agreed to deposit additional cash collateral with SpiritBank if the value of the pledged shares dropped below $10 million. Performance of a reasonably-equivalent-value analysis for purposes of a fraudulent conveyance claim would usually require a valuation of these contingent liabilities. However, believing Brooke Corp received no value from the satisfaction of the NWPA, the Trustee did not try to prove the value of the obligations Brooke Corp assumed.

SpiritBank, on the other hand, argues that Brooke Corp received direct value as a result of the Option Agreement and that the liabilities it assumed were reasonably equivalent to that value. SpiritBank's assertions of direct value are as follows:

> Benefit to Aleritas and Brooke Corp, as its parent, from the decrease in interest expense totaling approximately $21.4 million resulting from the retirement of the Secured 12% [Falcon-Jordan] Notes;

> Benefit to Brooke Corp from the replacement of the mandatory repurchase obligation liability of approximately $51.75 million with the $10 million Brooke Corp Obligations; . . . .

> Benefits from the opportunity to retire the Secured 12% Notes outside of the contractual prepayment window and at a reduced premium, resulting in savings of not less than approximately $1.02 million; [and]

> Benefits from the ability to resell its interest in the Participation Agreement in the event that SpiritBank

33

exercised the option.[89]

Of these four items, only the second describes a potential direct value received by Brooke Corp. The first and the third describe direct benefits to Aleritas as the obligor on the Falcon-Jordan Notes, not direct benefits to Brooke Corp, which was not an obligor. The fourth item describes the right of Brooke Corp to dispose of the participation interest if SpiritBank exercised its rights under the Option Agreement and Brooke Corp was required to purchase the participation interest. It is a means for Brooke Corp to minimize the impact of the burdens imposed by the Option Agreement, and is not a direct benefit it received by entering into the Option Agreement.

This leaves the second item as the only potential direct benefit to Brooke Corp from the execution of the Option Agreement.[90] It relates to Brooke Corp's contingent obligation under the NWPA to purchase the Falcon-Jordan Notes in the event of the occurrence of a Mandatory Repurchase Event with respect to the parent. This contingent obligation is stated in section 3.1(b) of the NWPA, which provides that Aleritas will give the noteholders notice and an offer to purchase all of the outstanding notes five business days "prior to the occurrence of _any_ Mandatory Repurchase Event."[91] The section also provides that if Aleritas "does not purchase the Notes in connection with the occurrence

---

[89] Doc. 170 at 22.

[90] In a post-trial pleading, SpiritBank argues that the refinancing of the Falcon-Jordan Notes released Brooke Corp from liability under a cross-default provision of the NWPA. Doc. 173 at 7. There was no evidence of such a provision, and the Court has not found such a provision in its review of the NWPA.

[91] Exh. 32 at 9 (emphasis supplied).

34

of a Mandatory Repurchase Event *with respect to the Parent* [Brooke Corp], within the time period provided herein, then the Parent shall be obligated hereunder to promptly purchase the Notes on the terms set forth herein."[92]

This is the only provision of the NWPA that imposes liability on Brooke Corp. The Court interprets the NWPA to mean that this liability may arise only when there is a Mandatory Repurchase Event under subsection (i) of the Mandatory Repurchase Event definition, which provides:

> *(i) as to the Parent* [Brooke Corp], the occurrence of any one of any of the following events:  (a) either of Robert Orr or Leland Orr . . . ceases to own and control 80% of the Capital Stock of the Parent owned thereby on the Closing Date, . . . ; (b) any of Michael Lowry, Shawn Lowry and Anita Larson . . . ceases to own and control 80% of the Capital Stock of the Parent owned thereby on the Closing Date, . . . ; or (c) if Robert Orr, Leland Orr, Michael Lowry, Kyle Garst, Shawn Lowry and Anita Larson collectively ceases [sic] to possess the power . . . to direct or cause the direction of the management or policies of the Parent.[93]

This part of the definition begins with the phrase "as to the Parent."  Under section 3.1(b), Aleritas has a repurchase obligation if "*any*" Mandatory Repurchase Event occurs, but Brooke Corp, the parent, has such liability only if a Mandatory Repurchase Event "*with respect to the Parent*" occurs.  The NWPA provides that it shall be construed and interpreted in accord with New York law.  Under New York law, "'[w]hen parties set down their agreement in a clear, complete document, their writing . . . should be enforced

---

[92] *Id.*

[93] Exh. 33 at 13 (emphasis supplied).

according to its terms.'"[94]  This principle is particularly important when the contract "was

negotiated between sophisticated, counseled business people negotiating at arm's

length."[95]  This rule of construction requires the Court to give meaning to the "with

respect to the Parent" limitation in section 3.1(b) and to the phrase "as to the parent" in

subsection (i) of the definition of Mandatory Repurchase Event.  Section 3.1(b) was

carefully drafted to limit the Mandatory Repurchase Events that could be a basis for the

parent to be liable, in contrast to Aleritas, which is liable for any such event.  Subsection

(i), by beginning with the phrase "as to the Parent," carries out this intent.  To more

broadly construe those events that could be the basis for parent liability would render the

phrase "as to the Parent" in subsection (i) meaningless, and would eliminate the purpose

served by providing three elements to subsection (i).  Such a construction would leave to

the courts the task of deciding which portions of the definition of Mandatory Repurchase

Event might apply to the parent, a result inconsistent with the precise and complete terms

of the NWPA.

The events that would have given rise to a Mandatory Repurchase Event with

respect to the parent were generally under the direct control of the named stockholders

and those with the power to control the management policies of Brooke Corp.  The

bankruptcy of Aleritas would not have triggered a change of control as to the parent. Even

---

[94] *South Rd. Assocs., LLC, v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809, 4 N.Y.3d 272, 277, 793 N.Y.S.2d 835, 838 (2005) (*quoting Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E 2d 876, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765 (2004)).

[95] *Id.* (quoting *Vermont Teddy Bear*, 807 N.E.2d at 879, 1 N.Y.3d at 475).

the filing of a petition under Chapter 11 by Brooke Corp would not have been a change of control as to the parent unless a trustee was appointed. Carl Baronowski, general counsel of Brooke Corp, did not even include release from the repurchase obligation as a reason why the refinancing of the Falcon-Jordan Notes was important to Brooke Corp. Although the Trustee acknowledges that the payoff of the Falcon-Jordan Notes completely removed the possibility that Brooke Corp would be required to pay off those notes, he concludes that under the facts and circumstances presented, the value of that removal was effectively zero and therefore not substantially equivalent to the obligations Brooke Corp assumed under the Option Agreement.

The Court finds that SpiritBank has not refuted the Trustee's conclusion. After thorough review, the Court has concluded that both the written report and the testimony of SpiritBank's expert, Jack F. Williams, contending Brooke Corp received reasonably equivalent value under the Option Agreement, are unreliable and not persuasive.

There are several deficiencies in the report which lead the Court to this conclusion. Mr. Williams opined in his written report that "Brooke Corp received substantial value, reasonably equivalent from an economic perspective, in exchange for the incurrence of the Brooke Corp Obligations, the Pledged Aleritas Shares, and the first priority security interest in the $2 Million CD."[96] Such value is stated to be the aggregate value of six benefits, comprised of (1) the reduction of the interest rate resulting from the retirement of Falcon-Jordan Notes; (2) the replacement of the obligation to repurchase the Notes for

---

[96] Exh. VVVV at 11.

approximately $51.7 million with the $10 million obligation to SpiritBank; (3) the

opportunity to retire the Falcon-Jordan Notes before maturity with a reduced penalty;

(4) SpiritBank's acceptance of alternative forms of collateral in lieu of cash collateral;

(5) the extension of the closing date for Brooke Corp's obligation to purchase

SpiritBank's participation interest; and (6) SpiritBank's deferral of the exercise of its right

to realize on its collateral upon default.[97]  Of these 6 alleged benefits, only the second is a

direct benefit to Brooke Corp.  Mr. Williams assigned no separate value to this direct

benefit.  In addition, Mr. Williams's report does not describe the Mandatory Repurchase

Event contingency with specificity.  It simply states, "The Note Repurchase Agreement

included a mandatory repurchase provision triggered by certain 'change of control'

events."[98]  In short, there is nothing in the report to indicate that Mr. Williams limited the

contingency at issue to a Mandatory Repurchase Event as to the parent, as it is limited in

the NWPA.

Furthermore, although Mr. Williams's testimony supplemented his report, the

Court remains unconvinced.  Mr. Williams testified that it was more likely than not,

approaching highly likely, that one of the events listed in subsections (i)(c), (iii), and (iv)

of the definition of Mandatory Repurchase Event in the NWPA, quoted above in the

findings of fact, would trigger Brooke Corp's repurchase obligation during the term of the

---

[97] *Id.* at 47.

[98] *Id*. at 25.

Falcon-Jordan Notes.[99]  Of these, only subsection (i)(c) defines a Mandatory Repurchase Event that applies to the parent and therefore could eventually have triggered Brooke Corp's obligation.  Subsection (iii) defines as a Mandatory Repurchase Event Brooke Corp's failure to own 80% of the stock of Aleritas that it held on the closing date, and subsection (iv) concerns Brooke Corp's ownership of the stock of two other Brooke entities.  Although these subsections involve Brooke Corp, they are not part of the definition of a Mandatory Repurchase Event as to the parent.  Mr. Williams did not separately address or determine the likelihood of event (i)(c), the only one of the three events that is within the relevant definition.

As in his written report, Mr. Williams's testimony did not specify the value of the direct benefit Brooke Corp received as a result of the refinancing.  Further, also as in the written report, Mr. Williams did not assign a value to the obligations Brooke Corp incurred in the Option Agreement, even though they were contingent.  The closest Mr. Williams came to assigning values to these things was his discussion of the relative probabilities that a Mandatory Repurchase Event and Brooke Corp's repurchase obligation under the Option Agreement would occur, but even this comparison was flawed because of his failure to recognize that only certain changes of control, those defined in the NWPA as changes of control with respect to the parent, are relevant.

Further, Mr. Williams determined the probability of Brooke Corp's contingent liability under the NWPA in isolation from the other terms of the NWPA.  Default is

---

[99] Tr. vol. II at 161:10 to 162:5 and 167:10-13.

broadly defined in the NWPA, and many circumstances could have occurred that might have caused Falcon-Jordan to declare a default even though no Mandatory Repurchase Event as to the parent had occurred. Carl Baronowski testified that in his opinion, Aleritas was in default under the NWPA at the time of the Note Purchase Agreement because of a double pledge of collateral. It appears to the Court that there was a significant probability of a default not involving a Mandatory Repurchase Event with respect to the parent, in which case Brooke Corp would have been relieved of its liability under the NWPA before a Mandatory Repurchase Event with respect to it, the parent, occurred. Mr. Williams gave no consideration to this possibility.

The Court concludes that the direct benefit Brooke Corp received from the release of a very remote contingent liability of $51.7 million had a value substantially less than $10 million. The $10 million obligation was approximately 20% of the $51.7 million potential mandatory purchase liability. The likelihood of a Mandatory Repurchase Event as to the parent occurring was substantially less than 20%. The direct value which Brooke Corp received from entering into the Option Agreement was not substantially equivalent to the value of the obligations it assumed.

For the foregoing reasons, the Court determines, based upon the record before it, that the Trustee has sustained his burden to prove that Brooke Corp did not receive direct benefits with a value reasonably equivalent to the value of the obligations it assumed under the Option Agreement.

**c. When executing the Option Agreement on March 6, 2008, did Brooke Corp**

40

**receive an indirect value reasonably equivalent to the value of the obligations it assumed?**

When a court finds that a trustee has sustained the burden to show the debtor did not receive a direct benefit with a value reasonably equivalent to the value of what the debtor gave up in the transaction, the burden shifts to the defendant to show the debtor received reasonably equivalent value from an indirect benefit.[100]  SpiritBank contends that Brooke Corp received the following indirect benefits from the execution of the Option Agreement:  the "[b]enefit to Aleritas and Brooke Corp, as its parent, from the decrease in interest expense totaling approximately $21.4 million resulting from the retirement of the [Falcon-Jordan Notes]" and "[b]enefits from the opportunity to retire the Secured 12% [Falcon-Jordan] Notes outside of the contractual prepayment window and at a reduced premium, resulting in savings of not less than approximately $1.02 million."[101] SpiritBank's position rests upon the principle that "[w]hen a debtor-parent gives a 'downstream' guarantee of obligation of its subsidiary, the bankruptcy court will presume that the debtor-parent received a benefit (increased stock value resulting from increased strength and value of subsidiary due to its receipt of proceeds of loan guaranteed by parent)."[102]

---

[100] *Cooper v. Centar Invests. (Asia) Ltd. (In re TriGem Amer. Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010).

[101] Doc. 170 at 22.

[102] Doc. 168 at 9 (*citing Renegade Holdings*, 457 B.R. 441).  *Renegade* stated, "'Generally, transfers to a solvent subsidiary are considered to be for reasonably equivalent value, because, since the parent is the sole shareholder of the subsidiary corporation, any benefit received by the subsidiary is also a benefit to the parent.'" 457 B.R. at 444-45 (*quoting Branch v. Fed. Deposit Ins. Corp.*, 825 F.Supp. 384,

The Trustee responds that the Option Agreement was, in substance, a guaranty of Aleritas's obligation to purchase SpiritBank's participation interest, and that a parent's guaranty of an *insolvent* subsidiary's debt does not result in a benefit to the parent. He relies on cases holding that the presumption of a benefit to the parent from the parent's guaranty of the subsidiary's obligation is not available if the subsidiary whose obligation was guaranteed was insolvent at the time of the transaction in which the guaranty was extended.[103]

The Court agrees with the Trustee that the Option Agreement in substance is a guaranty of Aleritas's obligation to SpiritBank as a participant in the FSB Loan. The purpose of the Option Agreement was to induce SpiritBank to participate in the FSB Loan by Brooke Corp's providing additional collateral for and an additional entity obligated to satisfy SpiritBank's investment in the participation interest. Under Kansas law, a "guaranty is a contract between two or more persons, founded upon consideration, by which one person promises to answer to another for the debt, default or miscarriage of a third person, and, in a legal sense, has relation to some other contract or obligation with reference to which it is a collateral undertaking."[104] Section 3 of the Option Agreement is titled "Brooke [Corp]'s Secured Guaranty."[105] It provides that if SpiritBank timely

---

399-400 (D.Mass. 1993).

[103] Doc. 171 at 35-36 (*citing Renegade*, 457 B.R. at 445; *In re Worldcom, Inc.,* 2003 WL 23861928 at *41 (Bankr. S.D.N.Y. Oct. 31, 2003)).

[104] *Trego Wakeeny State Bank v. Maier*, 214 Kan. 169, 173, 519 P.2d 743, 747 (1974).

[105] Exh. F-1 at 2. In the Option Agreement, Brooke Corp is referred to as "Brooke."

42

exercises its take-out option by giving notice and has not timely received the purchase price of its participation interest in the FSB Loan from Aleritas, then Brooke Corp agrees to pay SpiritBank the purchase price. It further states that "Brooke [Corp] hereby agrees and acknowledges that this provision shall be interpreted and enforced as a Guaranty of payment and performance of the obligations hereunder which guaranty shall be enforceable by SpiritBank in any court of competent jurisdiction." The report of SpiritBank's expert refers to Brooke Corp's obligation as a guaranty of payment and performance.[106] SpiritBank's internal documents relating to its purchase of the participation interest refer to Brooke Corp in the "Guarantors & Co-makers" section.[107] The Court rejects SpiritBank's position that Brooke Corp was not a guarantor because "[t]here was never any agreement by Brooke Corp to satisfy Aleritas' obligation under the FSB loan."[108] Although the statement is technically correct, Brooke Corp did guarantee SpiritBank's collection of its share of the FSB Loan through the secured take-out option.

In support of his position that a parent's guaranty of an insolvent subsidiary's obligation does not provide value to the parent, the Trustee relies primarily on *Renegade Holdings*.[109] In that case, the Chapter 11 trustee brought an adversary proceeding to

---

[106] Exh.VVVV at 31.

[107] Exh. 13 at 5 & exh. 14 at 4.

[108] Doc. 173 at 10.

[109] 457 B.R. 441.

Case 09-06070    Doc# 185    Filed 11/20/15    Page 43 of 60

avoid, as constructively fraudulent, the corporate debtor's guaranty of an insolvent subsidiary's loan. The defendant moved to dismiss the complaint on the premise that, as a matter of law, the debtor received reasonably equivalent value as a result of an indirect benefit to the debtor. The court thoroughly examined the law regarding the indirect benefit a parent company receives when it guaranties the obligations of a subsidiary. "As a general rule, obligations incurred by a debtor solely for the benefit of a third party are treated as not supported by a reasonably equivalent value."[110] But "an exception . . . has been recognized where a debtor receives an indirect benefit from paying or guaranteeing the obligation of a third party."[111] For example, a debtor's transfers to its solvent subsidiary are considered to be for reasonably equivalent value "because, since the parent is the sole shareholder of the subsidiary corporation, any benefit received by the subsidiary is also a benefit to the parent.'"[112] However, "[t]his presumption of indirect benefit . . . is not available if the subsidiary . . . is insolvent at the time of the transaction in which the guaranty is extended."[113] The complaint in *Renegade* effectively alleged that the subsidiary was insolvent when the parent guaranteed its obligation.[114] The motion to dismiss was denied because the Trustee had effectively alleged the lack of an

---

[110] *Id*. at 444.

[111] *Id*.

[112] *Id*. at 444-45.

[113] *Id*. at 445.

[114] *Id*.

Case 09-06070    Doc# 185    Filed 11/20/15    Page 44 of 60

indirect benefit and therefore the absence of reasonably equivalent value, even though the guaranty involved related corporations. Other courts have adopted similar reasoning with respect to transfers from a parent to an insolvent subsidiary.[115]

In its briefs, SpiritBank contends that *Renegade* is inapplicable. Instead, it argues that Aleritas's insolvency is irrelevant because Brooke Corp received the alleged direct benefit of the payoff of the Falcon-Jordan Notes. SpiritBank relies on case law holding that the debtor receives reasonably equivalent value in return for paying the debt of a third person when the debtor has the use of the goods and services for which the debt was incurred.[116] It is true that the insolvency is irrelevant to the extent that a direct benefit was received, but the Trustee's argument that the insolvency of Aleritas is relevant applies to the allegation that Brooke Corp indirectly received reasonably equivalent value because of the direct benefit to Aleritas.

SpiritBank's expert, Jack F. Williams, when opining that Brooke Corp received reasonably equivalent value based upon its status as the parent of Aleritas, does not mention Aleritas's insolvency. This omission is very troublesome to the Court because

---

[115] *E.g., In re Pace*, 456 B.R. 253, 272 ("Transfers to a debtor's wholly-owned but insolvent company do not furnish 'reasonably equivalent value.'"); *In re Worldcom, Inc.*, 2003 WL 23861928 at *41 ("Courts have found a parent's transfer of assets to a subsidiary to be for less than reasonably equivalent value when the subsidiary was insolvent at the time of transfer."). *See also Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 579-81 (7th Cir. 1998) (transferee failed to show debtor received reasonably equivalent value for guarantee of loan owed by liquidated affiliate).

[116] Doc. 173 at 12 (citing *In re Evans Potato Co*., 44 B.R. 191,193-94 (Bankr. S.D. Ohio 1984); *In re Rodriguez*, 895 F.2d 725, 728 n.5 (11th Cir. 1990); and *In re Chicago, Missouri & W. Ry. Co.*, 124 B. R. 769, 733 (Bankr. N.D. Ill. 1991)).

Mr. Williams is the author of two law review articles which support the Trustee's position

that Aleritas's insolvency is relevant.  In *Revisiting the Proper Limits of Fraudulent*

*Transfer Law*, Mr. Williams stated:

> The payment or guaranty by the parent of a wholly-owned
> subsidiary's debt is less problematic because the courts have
> held that the parent presumably benefits from a reduction in
> debt of its "asset," i.e., the subsidiary's stock it holds.  This
> may not necessarily be the case.  For example, you represent
> Bravo Corp. which wants to enter into a data-processing
> contract with Lima Corp., the wholly-owned subsidiary of
> November Corp.  Bravo demands November Corp. to
> guarantee LimaCorp.'s obligations under the data processing
> contract.  Do the transactions contemplated generate any
> fraudulent transfer risks for Bravo?  The guaranty fact pattern
> depicts the classic downstream guaranty situation.  Most
> courts would conclude that because November owned the
> stock in Lima, if the transaction benefitted Lima, that benefit
> would "ride-up" to November through the stock ownership.
> *See, e.g., Lawrence Paperboard Corp. v. Arlington Trust Co.*
> *(In re Lawrence Paperboard Corp.)*, 76 Bankr. 866, 871
> (Bankr. D.Mass. 1987).  *But what if Lima is hopelessly*
> *insolvent at the time of the guaranty?  If so, the guaranty by*
> *November may well have been a fraudulent transfer.*  Why?
> Because the unsecured creditors of November are harmed by
> the transaction.  Assuming no increase in November's net
> worth, a safe assumption when the subsidiary is in a
> precarious financial situation, November's unsecured
> creditors will go to judgment and execute on the worthless
> stock in Lima, a hopelessly insolvent company.  At the same
> time, the creditors would have to contend with the claims of
> Bravo to November's assets.  *See General Elec. Credit Corp.*
> *v. Murphy (In re Rodriguez)*, 895 F.2d 725 (11th Cir. 1990);
> *see* Flaschen, *Recent Bankruptcy Decisions Threaten Lenders*
> *with Increased Liability,* 11 BUSINESS LAWYER UPDATE,
> Jan./Feb. 1991, at 1, 2, 9.[117]

---

[117] Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J.
55, 87 n. 191 (1991) (emphasis supplied).

Three years after the publication of this article, in *The Fallacies of Contemporary Fraudulent Transfer Models*, Mr. Williams stated, "I have questioned this analysis [that the value received by a primary obligor-subsidiary redounds to the benefit of the parent-guarantor] *where the subsidiary is insolvent*."[118]  The *Renegade* court cited Mr. Williams's *Fallacies* article in support of the holding relied upon by the Trustee.[119]  The report of the Trustee's expert found that Aleritas was insolvent from December 31, 2005, and thereafter, with its negative equity growing from approximately $36.6 million on December 31, 2005, to $76.5 million as of December 31, 2007, and growing beyond that during 2008.

SpiritBank has not sustained its burden to prove that Brooke Corp received indirect value reasonably equivalent to the value of the obligations it assumed and the transfers it made.  The Court therefore finds that when Brooke Corp entered into the Option Agreement, it did not receive an indirect benefit having a value reasonably equivalent to the value of the obligations it incurred.

### d. When it paid the Deferral Fees in conjunction with the execution of the Second Amendment to Option Agreement, dated July 1, 2008, did Brooke Corp receive reasonably equivalent value?

The Second Amendment to Option Agreement, dated July 1, 2008, extended the date by which Brooke Corp was obligated to purchase SpiritBank's participation interest

---

[118] Jack F. Williams, *The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties:  Fraudulent Transfer Laws as a Fuzzy System*, 15 Cardozo L. Rev. 1403, 1426 n. 95 (March 1994) (emphasis supplied).

[119] *Renegade Holdings*, 457 B.R. at 447.

47

in the FSB Loan, which had previously been extended to May 16, 2008, to October 10, 2008. In conjunction with this agreement, Brooke Corp paid SpiritBank the Deferral Fees (a deferral fee of $25,000 and legal fees of $8,000).

The Trustee alleges that Brooke Corp did not receive reasonably equivalent value in return for these payments. First, he includes these transfers in his arguments about the Option Agreement.[120] His position is that because there was no consideration for the Option Agreement, there was also no consideration for the amendments.[121] But he provides no authority to support this position. The Court finds no reason to apply this approach since there are significant differences between the Deferral Fees on the one hand and the transfer to purchase the Brooke CD and the incurrence of the obligations under the Option Agreement on the other. Whereas the Option Agreement directly benefitted Aleritas because it induced SpiritBank to participate in the FSB Loan, the Deferral Fees paid in conjunction with the Second Amendment to Option Agreement directly benefitted Brooke Corp by deferring its purchase obligation. The finding that Brooke Corp did not receive reasonably equivalent value for the execution of the Option Agreement does not apply to the Deferral Fees.

The Trustee also argues that Brooke Corp did not receive reasonably equivalent value for the $33,000 in Deferral Fees because they "simply resulted in SpiritBank forbearing for a few weeks from foreclosing on its collateral," which "did not materially

---

[120] Doc. 171 at 40-41.

[121] Depo. of Christopher J. Redmond dated Sept. 24, 2014 at 32:13-19.

48

or 'concretely' benefit Brooke Corp in any way."[122] The Court disagrees. Forbearance of the enforcement of loans has been recognized as reasonably equivalent value for the granting of security interests in additional collateral[123] and for the execution of a modification agreement that required the payment of an extension fee.[124] Such forbearance provided Brooke Corp with breathing room — an opportunity to obtain funds to purchase the participation interest. There is no evidence that the Second Amendment to Option Agreement was other than an arm's-length transaction in which the parties agreed that $33,000 was appropriate consideration for the benefit to Brooke Corp. The Court finds no basis to conclude that the value was not reasonably equivalent to the direct benefit received by Brooke Corp.

The Court therefore finds that Brooke Corp's payment of the Deferral Fees to SpiritBank was not a constructively fraudulent transfer.

### 4. Conclusion on the Trustee's Fraudulent Transfer Claim.

For the foregoing reasons, the Court finds that the Trustee has prevailed on his contention that Brooke Corp's entering into the Option Agreement, pursuant to which the $2 million was transferred to SpiritBank for purchase of the Brooke CD and SpiritBank subsequently liquidated the Brooke CD, was a fraudulent transfer under § 548 (B)(i).

---

[122] Doc. 171 at 48.

[123] *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, 2002 WL 31412465 at *6 (S.D.N.Y. Oct. 24, 2002).

[124] *Pembroke Dev. Corp. v. Commonwealth Savs. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400-01 (Bank. S.D. Fla. 1991).

49

Brooke Corp had an interest in the $2 million transferred to SpiritBank to purchase the Brooke CD and did not receive a reasonably equivalent direct or indirect value in return when it entered into the Option Agreement. The Trustee is therefore entitled to a judgment avoiding Brooke Corp's obligations under the Option Agreement, the transfer of the Brooke CD to SpiritBank, and SpiritBank's liquidation of the Brooke CD.

However, because Brooke Corp received a direct benefit with a value reasonably equivalent to the $33,000 in Deferral Fees it paid in conjunction with the execution of the Second Amendment to Option Agreement, the Trustee may not avoid the transfer of the Deferral Fees.

## B. THE TRUSTEE'S UFTA CLAIM.

As permitted by § 544(b)(1) of the Bankruptcy Code, the Trustee also seeks to avoid and recover the allegedly fraudulent transfers under the Kansas version of the Uniform Fraudulent Transfer Act, codified at K.S.A. 33-201 to -212. Subsections 33-204(a)(2) and 33-205(a) of the Kansas UFTA are substantively similar to § 548(a)(1)(B).[125] Neither the Trustee nor SpiritBank has suggested the UFTA requires a different analysis in this case. The Court therefore finds that its rulings under § 548 are equally applicable to the UFTA claim. Under the UFTA, the Trustee may avoid the Option Agreement and the transfer of the Brooke Corp CD to SpiritBank, but not the payment of the Deferral Fees.

---

[125] *See* 5 *Collier on Bankruptcy*, ¶ 548.01[2][a] at 548-15 ("For the most part, the UFTA tracks section 548.").

## C.  SPIRITBANK'S GOOD-FAITH DEFENSE UNDER § 548(c) OR K.S.A. 33-208(a).

Section 548(c) of the Bankruptcy Code provides:

> Except to the extent that a transfer or obligation voidable under this section [548] is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

When both value and good faith are present, the transferee is given a lien on the property transferred.  In essence, good faith transferees are entitled to set off the value they gave to the debtor against the amount of the voidable transfer they received from the debtor.[126] The burden is on the defendant to prove the defense.[127]  K.S.A. 33-208(a) provides that a "transfer or obligation is not voidable under subsection (a)(1) of K.S.A. 33-204 against a person who took in good faith and for a reasonably equivalent value."

SpiritBank is not entitled to a lien under the good-faith defense because it did not give value to Brooke Corp for the transfer of the Brooke CD.  Section 548(c) expressly requires the giving of value to the debtor.  To the extent that a transferee does not give value to the debtor for purposes of determining reasonably equivalent value under

---

[126]  *Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 242-43 (10th Cir. 1991).

[127]  *Jobin v. McKay (In re M & L Business Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).

51

§ 548(a)(1)(B), such transferee likewise does not give value for purposes of § 548(c).[128]

SpiritBank is not protected by the defense provided by K.S.A. 33-208(a) because it did

not give the Debtor a reasonably equivalent value for the transfers it received.

As explained above, SpiritBank gave no value to Brooke Corp in exchange for the

Option Agreement and the transfer of the Brooke CD. SpiritBank is therefore not entitled

to limit the Trustee's recovery under § 548(c) or K.S.A. 33-208(a).

## D. THE TRUSTEE'S PREFERENTIAL TRANSFER CLAIM.

The Trustee also asserts a claim to avoid SpiritBank's cashing of the Brooke CD

on September 4, 2008, as a preferential transfer under § 547(b). When submitting

proposed findings of fact and conclusions of law, the Trustee asserts that all of the

elements for avoiding a preference are satisfied.[129] SpiritBank's proposed findings

suggest that § 547(b)(5) is not satisfied because cashing the CD did not allow it to receive

more than if the transfer had not been made.[130]

The Trustee contends that SpiritBank received more by cashing the CD than it

would have in a liquidation of Brooke Corp. Apparently, the Trustee is assuming that if

he prevails on his fraudulent conveyance claim concerning the Option Agreement and the

transfer of the Brooke CD is thereby avoided, then SpiritBank does not have a perfected

---

[128] *Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.)*, 346 B.R. 798, 806 (8th Cir. BAP 2006) (*citing Helms v. Roti (In re Roti)*, 271 B.R. 281, 299 (Bankr. N.D. Ill 2002)). *Roti* also said,"[C]ourts have denied use of the § 548(c) shelter to defendants who were not able to establish 'reasonably equivalent value' for purposes of § 548(a)(1)(B)." 271 B.R. at 299.

[129] Doc. 171 at 23-24 and 49-51.

[130] Doc. 170 at 33-34.

security interest in the Brooke CD.  No authority is provided for predicating a preferential transfer on a successful fraudulent conveyance action, and the Court declines to do so.  In the Court's experience, avoidance actions are generally asserted in the alternative, not cumulatively.

When the preference claim is viewed independently of the fraudulent conveyance claim, it is apparent that the Trustee may not avoid the transfer of the Brooke CD to SpiritBank as a preferential transfer.  Spiritbank's interest in the Brooke CD was perfected.  SpiritBank had possession of the CD if it was in paper form, and control of the CD if it was in book entry form.[131]  "Generally, payments to a fully secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation."[132]  The Trustee's preference avoidance claim therefore fails since § 547(b)((5) is not satisfied.

**E.  THE TRUSTEE'S RECOVERY UNDER § 550.**

The Trustee seeks to recover the value of the Brooke CD from SpiritBank under § 550(a), which allows the recovery of a transfer avoided under either § 544 (which incorporates the Kansas UFTA) or § 548 from the initial transferee or any immediate or mediate transferee of the initial transferee.  There is a significant difference in the liability of an initial transferee and a subsequent transferee.  An initial transferee is strictly liable

---

[131] See 2 Barkley Clark and Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 7.09 (3d ed., 2015).

[132] 5 *Collier on Bankruptcy*, ¶ 547.03[7] at 547-39 to -40.

53

to the trustee for an avoided transfer.[133]  A subsequent transferee is liable only if it did not take the transfer for value, in good faith, and without knowledge of the transfer's voidability.[134]  "Initial transferee" is not defined by the Bankruptcy Code.  Case law has established that "[g]enerally, the party who receives a transfer of property directly from the debtor is the initial transferee."[135]  "[A]n initial transferee is one that has dominion over the funds [or other property] transferred."[136]  But those who act as mere conduits or financial intermediaries are not initial transferees under § 550(a).[137]

SpiritBank was an initial transferee.  Brooke Corp transferred $2 million to SpiritBank for the purchase of the Brooke CD at SpiritBank.  Pursuant to the Option Agreement, SpiritBank retained possession or control of the Brooke CD as security for Brooke Corp's repurchase obligation in the event SpiritBank exercised its take-out right.  Then in September 2008, SpiritBank applied the proceeds of the Brooke CD to Brooke Corp's obligation.

SpiritBank's defense to liability under § 550 is without merit.  First, in an apparent attempt to avoid initial transferee liability, SpiritBank states that "Brooke Corp was

---

[133] 11 U.S.C. § 550(a)(1).

[134] 11 U.S.C. § 550(b).

[135] 5 *Collier on Bankruptcy*, ¶ 550.02[4][a] at 50-20.

[136] *Hopkins v. D.L. Evans Bank (In re Fox Bean Co., Inc.)*, 287 B.R. 270, 283 (Bankr. D. Idaho 2002).

[137] *Northern Capital, Inc., v. Stockton Nat'l Bank (In re Brooke Corp.)*, 458 B.R. 579, 584-85 (Bankr. D. Kan. 2011).

54

merely a conduit of the funds for the CD."[138]  But status as a conduit rather than an initial transferee under § 550 refers to a recipient of the transferred property — SpiritBank in this case — and not the debtor or other entity that made the transfer.  Second, in an apparent attempt to fit within the conditional liability of a subsequent transferee under § 550(b), SpiritBank argues that it took for value, in good faith, and without notice of the voidability of the transfer.[139]  But this defense is available only to a subsequent transferee, one who took the property from the initial transferee.  SpiritBank was not a subsequent transferee.

The Trustee is therefore entitled to a judgment against SpiritBank for $2,012,491.67 based on the avoidance of the transfer of the Brooke CD.

## F.  PREJUDGMENT INTEREST WILL NOT BE AWARDED.

The Trustee requests an award of prejudgment interest on his claims for avoidance of the transfers of the $2 million Brooke CD and the Deferral Fees.  He wants interest totaling $1,232,294.95 for the period from April 14, 2009, the date the original Trustee made a demand on SpiritBank, through April 29, 2015, plus additional prejudgment interest accruing thereafter at $561.41 per diem.  The interest is calculated at an annual rate of 10% under K.S.A. 16-201 on a principal amount of $2,045,491.67, which is the sum of the amount SpiritBank received when it liquidated the Brooke CD, $2,012,491.67, and the Deferral Fees of $33,000.  SpiritBank opposes the award and also argues that the

---

[138] Doc. 170 at 17.

[139] *Id*. at 18-19.

55

interest rate in inequitable. The Court agrees that prejudgment interest should not be awarded in this case, and therefore does not reach the question of an appropriate rate.

On this issue, both the Trustee and SpiritBank cite *Investment Bankers.*[140] In that case, the Tenth Circuit held that, as in other federal actions, unless there is a statute to the contrary, prejudgment interest may generally be awarded to a prevailing trustee in a bankruptcy avoidance action, "if 1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable."[141] With respect to fraudulent transfer actions, the Circuit observed that courts have traditionally awarded prejudgment interest to a successful trustee "from the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment."[142] However, "prejudgment interest 'is not recoverable as a matter of right. Instead, 'awards of prejudgment interest are governed by fundamental considerations of fairness.'"[143] The trial court "has broad discretion in deciding whether to grant prejudgment interest,"[144] and a bankruptcy court's award of prejudgment interest is reviewed by an appellate court for

---

[140] *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556 (10th Cir. 1993).

[141] *Id.* at 1566.

[142] *Id.*

[143] *Diamond v. Bakay (In re Bakay)*, 454 Fed. Appx. 652, 654 (10th Cir. 2011) (*quoting U.S. Indus., Inc., v. Touche Ross & Co.*, 854 F.2d 1223, 1256 (10th Cir. 1988)).

[144] *FDIC v. Rocket Oil Co.*, 865 F.2d 1158, 1160 (10th Cir. 1989).

56

an abuse of discretion.[145]

The Court finds that an award of prejudgment interest would not be equitable in this case. The Trustee has prevailed on less than all of his claims. SpiritBank defended the Trustee's claims in good faith, relying upon the opinion of a well-known expert to support its position that it was not liable on the claims. Because of the delay inherent in the litigation of avoidance claims in cases as large and complex as the Brooke bankruptcies, this adversary proceeding was filed in 2009 but was not tried until 2015. To assess interest against SpiritBank in an amount exceeding 50% of the Trustee's claim because of that delay would be inequitable.

## G. THE COURT DECLINES TO RULE ON THE ALLOWANCE OF SPIRITBANK'S PROOF OF CLAIM.

The pretrial order states that one of the issues is "[w]hether the SpiritBank proof of claim is subject to disallowance pursuant to 11 U.S.C. § 502(d), until such time as SpiritBank pays to the Trustee an amount equal to the aggregate amount of the avoidable transfers plus interest thereon and costs."[146] But in the "Relief Sought" portion of the pretrial order, the Trustee asks for the proof of claim to be disallowed if the avoided transfers are not repaid within 30 days of the entry of a final, non-appealable order granting his motion for summary judgment.[147]

---

[145] *Inv. Bankers*, 4 F.3d at 1566.

[146] Doc. 124 at 6.

[147] *Id*. at 8.

57

The Court therefore declines to rule on this issue as part of its findings following trial. This denial is without prejudice. If the parties cannot agree about the impact of this decision on SpiritBank's proof of claim, the Court will resolve the issue in a separate hearing.

**CONCLUSION.**

The Court therefore holds: (1) under 11 U.S.C. § 548(a)(1)(b) and the Kansas Uniform Fraudulent Transfer Act, the Trustee may avoid the Option Agreement, including the pledge of the $2 million Brooke CD to SpiritBank and SpiritBank's subsequent cashing of the Brooke CD; (2) the Trustee may not avoid the Second Amendment to Option Agreement, including the transfer of the $33,000 in Deferral Fees to SpiritBank; (3) the transfer of the $2 million Brooke CD to SpiritBank is not avoidable as a preferential transfer under 11 U.S.C. § 547; (4) under § 550, SpiritBank is liable to the Trustee for $2,012,491.67; (5) prejudgment interest is not awarded to the Trustee; and (6) the effect of this judgment on SpiritBank's proof of claim is not decided, without prejudice to submitting the issue to the Court in a subsequent hearing if the parties are unable to reach an agreement on the issue.

Because this opinion does not resolve all of the Trustee's claims, the Court has considered whether to make its rulings on the claims it does resolve final and appealable.[148] Federal Rule of Civil Procedure 54(b), made applicable by Bankruptcy

---

[148] *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. and Pro.: Civil 4th*, § 2654 at 32-33 (2014 Thomson Reuters).

Rule 7054(a), provides: "When an action presents more than one claim for relief . . . , the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay." The Court finds the Trustee's claim to disallow SpiritBank's proof of claim, although related to the avoidance claims, is sufficiently distinct from them that it can be treated separately for purposes of finality. An objection to a proof of claim does not have to be brought as an adversary proceeding unless it includes a demand for relief of a kind specified in Bankruptcy Rule 7001. Disallowance of a claim under § 502(d) because the claimholder has not satisfied a liability under § 550 is not a kind of relief listed in Rule 7001. Although it was permissible for the Trustee to bring the § 502(d) claim in this adversary proceeding, he could have brought it separately in the main case.[149]

Having determined that the avoidance claims and the claims under § 502(d) are sufficiently distinct that a final judgment on the avoidance claims alone may properly be entered, the Court must next decide whether there is any just reason to delay the entry of such a final judgment. Despite "the strong federal policy against piecemeal review" of trial court decisions,[150] the Court is convinced there is no just reason to delay the entry of a final judgment in this proceeding on the Trustee's avoidance claims. A final favorable decision on the Trustee's avoidance claims must be reached in order for his § 502(d)

---

[149] *See id.*, § 2657 at 70.

[150] *Id.*, § 2659 at 104.

59

claim to succeed,[151] and once such avoidance claims are finally determined, a ruling under § 502(d) should be straightforward.

Consequently, the Court hereby certifies that a final judgment on the Trustee's avoidance claims as determined by this opinion should be entered pursuant to Rule 54(b).

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

**# # #**

---

[151] *See id.*, at 110 ("It is uneconomical for an appellate court to review facts on an appeal following a Rule 54(b) certification that it is likely to be required to consider again when another appeal is brought after the [trial] court renders its decision on the remaining claims.").